**UNION TRUST COMPANY OF MARYLAND**

v.

**CHARTER MEDICAL CORPORATION.**

**Civ. No. JFM–84–3829.**

United States District Court, D. Maryland.

July 11, 1986.

Lawrence J. Gebhardt, Gebhardt & Smith, Baltimore, Md., for plaintiffs.

William A. Hylton, Jr., Hylton & Gonzales, Baltimore, Md., H. Lamar Mixson, Bondurant, Miller, Hishon & Stephenson, Atlanta, Ga., for defendants.

## MEMORANDUM

MOTZ, District Judge.

Union Trust Company of Maryland, Inc. has brought this suit against Charter Medical Corporation in connection with certain representations allegedly made to Union Trust by Charter when it was pursuing a merger with a third company, Psych Systems, Inc. Union Trust was a major creditor of Psych Systems. Charter has moved for summary judgment. Discovery has been completed, the parties have submitted exhaustive memoranda and a hearing has been held.[1] Charter's motion will be granted.

## FACTS

Charter is a publicly held hospital management company. Psych Systems was in the business of developing and marketing computer systems and software in the mental health field. In late 1983 or 1984 Charter, based upon its favorable experience with a psychological testing system produced by Psych Systems, became interested in acquiring Psych Systems. Serious negotiations between the two companies concerning the possible acquisition began in March, 1984. By the time these negotiations commenced, Union Trust had loaned two million dollars to Psych Systems under an unsecured line of credit.

Psych Systems was not in good financial condition in the early part of 1984. Its audited financial statements for its fiscal year ending November 30, 1983 showed that it had sustained a net loss of over $1.2 million during that year. Its financial statements for the first quarter of its 1984 fiscal year showed that it had sustained a net loss of nearly $600,000 in that quarter. Nevertheless, based upon its preliminary review of the figures, Charter believed that a merger with Psych Systems would be desirable, and on June 8, 1984, Charter entered into a stock purchase agreement with the company's three controlling stockholders. Under this agreement Charter acquired slightly over 25% of the then outstanding shares of Psych Systems' common stock at $3.50 per share. Charter was to make a tender offer for the balance of the outstanding stock at $5.00 per share and upon completion of the tender offer a merger was to be effected between Psych Systems and a new subsidiary to be formed by Charter. After consummation of the merger an additional $1.50 per share was to be paid to the three major selling shareholders. The tender offer and the merger were subject to various conditions precedent. One of these conditions was that Charter not discover adverse undisclosed material facts upon a full review of Psych System's records. Another was that Psych System's sub-license to use the Minnesota Multi-Phase Personality Inventory ("MMPI") be extended by its licensor, NCI, through at least June 30, 1987.

In May 1984 Psych System's loan from Union Trust was in technical default because of the expiration of the line of credit. Representatives of Psych Systems told Union Trust about the possibility of the merg-

---

1. At the hearing the Court vigorously questioned Union Trust's counsel about the merits of the bank's claim. Counsel ably responded to this questioning. Nevertheless, the Court remains of the view which it expressed at the hearing that the facts do not support Union Trust's claims.

er with Charter, and the bank decided not to call the loan (which, regardless of the technical default, was on a demand basis) or to ask that the loan be collateralized.

On June 11, 1984, upon the closing of the stock purchase agreement, Charter assumed effective control of Psych Systems. It immediately installed five of its senior officers as members of Psych Systems' seven member board. Robert P. Porter, a senior officer of Charter, was made chairman and chief executive officer. Jerold Cooper, another Charter officer, was made vice president, secretary and treasurer, and he was sent to Baltimore to work on Psych Systems' affairs virtually on a full-time basis. Cooper's salary was paid by Charter. Decisions as to which of Psych System's trade payables would be paid were made at Charter's corporate headquarters in Macon, Georgia. Charter immediately put $289,000 into Psych Systems which, when added to the amount that it had paid for 25.1% of the stock, brought its total investment in Psych Systems to approximately $1,589,000.

On June 28, 1984, Union Trust, at Cooper's request wrote a letter to Psych Systems agreeing to waive the existing technical default. The letter stated that this default was being waived, pending completion of the merger, but that the bank was not waiving any other defaults. On July 5, 1985, Brooke Tucker, a vice president of Union Trust, met with Cooper and Robert Thornton, another Charter officer. Cooper and Thornton requested that the bank not call the loan "in view of the contemplated merger." They stated that Psych Systems could not grant a security interest in all of its collateral because that fact would have to be disclosed on the tender offer proxy and might adversely affect the offer. They further stated that Charter could not guarantee a repayment of the loan because, in light of the fact that Psych Systems was not yet a subsidiary of Charter, such a guaranty would violate the terms of Charter's loan agreements with its own

lenders. There was also discussion concerning the contemplated merger. According to Tucker's deposition testimony, Cooper told him that the various conditions precedent to the merger were "either satisfied or well on their way, an inch away." Tucker took this to mean that Charter was assuring him that the merger was going to be effected. However, he also testified that he knew that the conditions precedent to the merger had not yet been satisfied.

After the July 5th meeting Charter continued its review of Psych Systems' books.[2] This review led it to the conclusion that Psych Systems had substantially inflated its sales during the preceding fiscal year and that its financial condition was far worse than Charter had been led to believe. (Eventually, in light of the conclusion which it reached, Charter instituted suits—presently pending in this Court—against Psych Systems' three selling shareholders and Alexander Grant, Psych Systems' auditor.) Likewise, Charter's negotiations with NCI for the extension of the MMPI license floundered and no extension was obtained.

In late August Charter decided to cancel the $5.00 per share tender offer and on August 31st issued a press release to that effect. Thereafter, on September 12th, at Union Trust's request, a meeting was held between representatives of Charter, Psych Systems and Union Trust. The parties are not in agreement as to what occurred at that meeting. Union Trust alleges that certain tentative agreements (confirmed by Charter the following day) were reached, including a commitment by Charter to guarantee any overdrafts on Psych Systems' account with Union Trust and a commitment by Psych Systems to grant Union Trust a security interest in all of its assets. The Psych Systems' account was closed shortly thereafter and no overdrafts on it were ever made. After some delay Psych Systems did provide Union Trust with a security interest in all of its assets. However, shortly thereafter Psych Systems

**2.** Union Trust contends that by the time of the July 5th meeting Charter knew that there were problems with the accuracy of Psych System's financial statements. There is no evidence to support this contention. The deposition testimony of Robert Porter, upon which Union Trust erroneously relies, makes clear that the discovery of those problems occurred in mid July.

filed Chapter 11 proceedings and the bank's security interest was voided. The Chapter 11 proceedings are still pending.

———, 106 S.Ct. 2505, 2509–12, 91 L.Ed.2d 202 (1986).

## DISCUSSION

Union Trust asserts three claims against Charter: for promissory estoppel, fraud and what it calls "instrumentality/alter ego." The essence of each of these claims is that Charter misrepresented to Union Trust that it would merge with Psych Systems, that at the time it made these misrepresentations Charter knew that it was not going to effect the merger, that Charter utilized its position of dominance over Psych Systems to prevent the conditions to the merger from being consummated and that if Charter had not made its misrepresentations, Union Trust would have been able to obtain full repayment of the $2 million loan which it had made to Psych Systems. While Psych System's precarious financial condition at the time of the merger discussions raises extremely serious question as to the *bona fides* of Union Trust's allegation that it would have been paid in full if it had called the Psych Systems loan in July, 1984, the record has not been sufficiently developed to make summary judgment on that point appropriate. However, the record does establish that Union Trust's substantive allegations are factually unsupported and that summary judgment against it is therefore proper. *See, e.g., Fed.R.Civ.P.* 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, ——— –

## I.

■ Union Trust relies upon two series of representations allegedly made to it: those made at the July 5, 1984 meeting and those made at the September 12, 1984 meeting.[3] To the extent that Union Trust's claim is based upon the September 12th representations, it can be disposed of summarily. There is no evidence that any promises made at that meeting were not at least eventually performed or that any delay in their performance damaged Union Trust. Moreover, it is undisputed that no promise was made on September 12th that Psych Systems would merge into Charter. It is that alleged promise which lies at the very heart of Union Trust's claims.

■ The statements made at the July 5th meeting provide no sounder basis for Union Trust's claim. Promissory estoppel depends upon the making of a promise which the promisor should reasonably expect to induce action (or forebearance) on the part of the promisee (or a third person) and which does induce such action. Further, estoppel is not to be invoked unless injustice will result if the promise is not enforced. *Restatement (2d) of Contracts,* Section 90(1); *Maryland National Bank v. United Jewish Appeal Federation, Inc.,* 286 Md. 274, 407 A.2d 1130 (1979).[4]

**3.** At oral argument Union Trust contended for the first time that a letter dated July 9, 1984 from Brooke Tucker to Jerold Cooper reflected a third promise upon which promissory estoppel should be invoked. The fact that this contention was made at such a late date in these proceedings raises substantial question as to whether or not the bank in fact contemporaneously relied upon this alleged promise. In any event, the contention is meritless. The July 9th letter concludes by stating as follows: "Union Trust shall require financial reporting of current assets and liabilities every two weeks; additionally it shall require periodic audits by its personnel. Please keep me informed as to significant changes in the company." The first sentence reflects a commitment, upon which Tucker insisted and to which Charter agreed, that Psych Systems would continue (as it has in the past) to provide Union Trust with up to date reporting of Psych System's current assets and

liabilities. There is no evidence that Charter did not meet this commitment and Union Trust does not base its claim upon this commitment. Rather, what Union Trust contends is that the second sentence required Charter to keep Union Trust apprised of its intentions as to whether to go forward with the merger. Obviously, the letter imposes no such requirement. The letter was not written by a Charter representative but by Tucker—the loan officer at Union Trust—and the sentence in question *merely requests* that the bank be kept informed as to any "significant changes."

**4.** As the parties correctly note, it is not necessary to reach here the question of whether the more stringent standard of the original Restatement—requiring action or forebearance "of a substantial and definite character"—is still the law of Maryland.

Contrary to what Union Trust alleges, the record is undisputed that Charter did not promise at the July 5th meeting that it would merge with Psych Systems. Although Tucker testified that he understood from what was said to him that fulfillment of the conditions of the merger was only "inches away" and that the merger would be effected, he also candidly admitted that he was told by the Charter representatives that several of these conditions (including Charter being satisfied with the accuracy of the financial statements of Psych Systems and the extension of the MMPI license) had not yet been fulfilled and "that there was at least a possibility that the merger might not be consummated." Moreover, Tucker testified that Charter flatly refused to sign a guaranty of the Psych Systems loan. As Charter pointedly argues, what Union Trust is essentially arguing is that "no" means "yes."

■ Assuming that Charter did make an unconditional oral promise to merge, any reliance placed by Union Trust upon that promise would have been unreasonable as a matter of law. The Fourth Circuit has held in a similar context that "incurring ... large debts in reliance solely upon an oral promise of this nature clearly exceeds the bounds of commercial reasonableness." *RCM Supply Co. v. Hunter Douglas, Inc.*, 686 F.2d 1074, 1078 (4th Cir.1982). Other courts have reached the same conclusion on facts almost identical to those presented here. *See Gruen Industries, Inc. v. Biller*, 608 F.2d 274 (7th Cir.1979); *Silberman v. Roethe*, 64 Wis.2d 131, 218 N.W.2d 723 (1974).

Moreover, even assuming a promise and reasonable reliance upon it, injustice would not result if the alleged promise were not enforced. Union Trust is a large financial institution, not a stranger to major commercial transactions. It very well knew what it was doing on July 5, 1984. Perhaps it did not call the loan because it saw Charter as a major potential customer and wanted to establish a profitable banking relationship. Perhaps (despite its present assertions) it did not call the loan because, in light of Charter's weakened financial condition and the bank's unsecured position, it concluded that if it did so, it would be able to collect only a fraction of the amount due. An internal memorandum which Brooke Tucker later wrote to the file, indicated that at the meeting the bank was trying to "pressure" Charter into guaranteeing the loan.

In any event, whatever Union Trust's agenda and motivation at the July 5th meeting, it, as a sophisticated lender, took a calculated risk not to pull down the house of cards by calling the loan and, instead, to await the outcome of the possible Psych Systems/Charter merger. In effect, in instituting this suit Union Trust is trying to have it both ways; it seeks to obtain—after the fact in the re-created setting of the courtroom—what it alleges would have been the benefits of a decision to call the loan—a decision which, in the real setting of the commercial world, it contemporaneously declined to make.

## II.

■ Union Trust's claim for fraud falls for the same reasons as does its claim for promissory estoppel. Under both Maryland and Georgia law (whichever may be applicable here) the elements of a cause of action for fraud include the making of a false representation and justifiable reliance by the plaintiff upon that representation. *See, e.g., James v. Goldberg*, 256 Md. 520, 261 A.2d 753, 758 (1970); *Romedy v. Willett Lincoln-Mercury, Inc.*, 136 Ga.App. 67, 220 S.E.2d 74 (1975). As previously stated, the record makes clear that Union Trust can prove neither of these elements. Moreover, the representations upon which Union Trust relies were at most statements concerning Charter's future conduct. Such statements cannot be a predicate for a claim for fraud under either Maryland or Georgia law. *See Call Carl, Inc. v. BP Oil Corp.*, 554 F.2d 623 (4th Cir.), *cert. denied*, 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977); *Craft v. Drake*, 244 Ga. 406, 260 S.E.2d 475 (1979).

## III.

Union Trust denominates its third claim as one for "instrumentality/alter ego."

There is not any such cause of action. What Union Trust is seeking to do is to pierce the corporate veil to hold Charter liable for Psych Systems' obligation on the two million dollar loan.

At the outset two basic facts should be noted which make the assertion of this claim at best idiosyncratic. First, the loan on which Union Trust seeks to hold Charter liable was made by Union Trust long before Charter had any involvement with Psych Systems and solely on the basis of Union Trust's evaluation of Psych System's own financial condition. Second, this is not a case where Charter is alleged to have siphoned money away from Psych Systems. To the contrary, the record is undisputed that Charter pumped substantial money into Psych Systems.[5]

When distilled to its essence, all that Union Trust really appears to be alleging is that after entering into the stock purchase agreement and placing its representatives on the board and in positions of executive authority at Psych Systems on June 11, 1984, Charter was in a position to control whether or not the merger agreement between Psych Systems and Charter would be consummated. According to Union Trust, Charter acted in bad faith in preventing fulfillment of the conditions precedent to the merger.

■ Even thus distilled, Union Trust's claim is clearly without merit. There were two primary conditions precedent to the merger. The first was that Charter had to be satisfied that the warranties which had been made to it concerning Psych System's financial condition were substantially true. After its full review of Psych System's records, Charter concluded that Psych System's financial condition was not as it had been warranted. This conclusion was not based upon anything which Charter did when it was in control of Psych Systems but upon its own evaluation of practices which Psych Systems had followed before Charter became involved. While the three selling shareholders of Psych Systems and Alexander Grant & Co., Psych Systems prior independent auditor, contend that Charter's evaluation is incorrect, this is matter of substantial dispute (presently in litigation in this Court), and Union Trust has come forward with no evidence to suggest that Charter raised a false issue in bad faith solely for the purpose of avoiding the merger.

The second major condition precedent to the effectuation of the merger was the extension of the MMPI license by NCI. Extensive negotiations were held between NCI and Charter concerning this extension and the depositions of the NCI representatives involved in those negotiations have been taken. Not unpredictably, the NCI representatives have testified that they were bargaining in good faith, and they have alluded to what they perceived as mistakes made by Charter during the course of the negotiations. However, Union Trust has produced no evidence to demonstrate that the extension would have been granted by NCI on terms reasonably acceptable to Charter or that Charter conducted the negotiations with NCI in bad faith to avoid the merger. Rather, in seeking to resist summary judgment Union Trust embarks upon a course of rank speculation concerning what would have happened if the negotiations between Charter

---

5. The Fourth Circuit has identified eight secondary factors to be considered in determining whether to pierce corporate veil: (1) gross undercapitalization; (2) failure to observe corporate formalities; (3) non-payment of dividends; (4) insolvency of the debtor corporation at the time of the transaction complained of; (5) syphoning of funds; (6) non-functioning of officers or directors other than the dominant stockholders; (7) absence of corporate records; and (8) the fact that the corporation is merely a facade for the operation of the dominant stockholder. See DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co., 540 F.2d 681 (4th Cir.

1976). See also Cunningham v. Rendezvous, Inc., 699 F.2d 676 (4th Cir.1983); Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc., 275 Md. 295, 340 A.2d 225 (1975); In re: Mid-Atlantic Toyota Anti-Trust Litigation, 525 F.Supp. 1265, 1275 (D.Md.), modified, 541 F.Supp. 62 (D.Md.1981), aff'd 704 F.2d 125 (4th Cir.1983). Most of these factors are irrelevant in the context of the present case. Those which may have at least tangential relevance, such as the observance of corporate formalities, argue in favor of not piercing the corporate veil under the facts as they have been established on the summary judgment record.

and NCI had taken a different turn. The concrete fact is that NCI never offered to grant the extension and that its refusal to do so provided Charter with a sound and permissible reason for not going forward with the merger.

A separate order granting Charter's motion for summary judgment and entering judgment on its behalf is being entered herewith.