649 A.2d 1145

James E. KILEY, Jr. et ux.

v.

FIRST NATIONAL BANK OF MARYLAND.

No. 137, Sept. Term, 1994.

Court of Special Appeals of Maryland.

Nov. 30, 1994.

320

James E. Kiley (Mary C. Kiley, on the brief), Potomac, pro se.

J. Mitchell Kearney (Eric M. Davis, and Miles & Stockbridge, on the brief), Baltimore, for appellee.

Argued before GARRITY *, ALPERT and HOLLANDER, JJ.

HOLLANDER, Judge.

Appellants, James and Mary Kiley, sued appellee, First National Bank of Maryland (the "Bank"), in a multi-count complaint filed in the Circuit Court for Montgomery County. The Kileys sought compensatory and punitive damages stemming from the Bank's alleged breach of contract and tortious misconduct. The gravamen of appellants' various causes of action centers on their contentions that the Bank improperly attempted to impose service charges with respect to the Kileys' checking account, unilaterally sought to alter the terms applicable to their checking account, and wrongfully closed their checking account.

The Kileys requested over 25 million dollars in punitive and compensatory damages. They sought recovery, *inter alia,* for the following: lost interest on their checking account for the duration of their expected lifetimes; the anticipated losses due to the minimum balance requirements and service charges;

---

* Judge Garrity participated in the argument and decision in this case but retired from the Court prior to the filing of the Opinion.

emotional distress; and injury to their reputation and credit. The parties filed cross motions for summary judgment; this appeal followed the entry of summary judgment in favor of the Bank. Finding no error, we shall affirm.

The Kileys present two compound questions for consideration:

I. Whether the lower court erred in granting summary judgment in favor of First National when there are material questions of fact unresolved; *e.g.*, whether the bank is estopped from denying the terms of its contract, whether the bank waived closing the checking account, whether the bank had sufficient funds on deposit from which it could have paid two checks when it dishonored them, and whether the bank wrongfully deposited a direct-deposit paycheck and refused access to the deposits even after a formal demand.

II. Whether the lower court erred in failing to grant the Kileys' request for summary judgment on the tort claims, when the evidence regarding these claims was undisputed and appellants' arguments were unrebutted.

Maryland Rule 2–501 permits the entry of summary judgment where "there is no genuine dispute as to any material fact, and the party is entitled to judgment as a matter of law." In resolving a motion for summary judgment, it is not for the trial judge to decide disputed facts. Moreover, in determining whether there are any material facts in dispute, the trial court must resolve all inferences in the light most favorable to the party opposing the motion. Any inferences drawn by the trial court must be reasonable ones. *Beatty v. Trailmaster Products, Inc.,* 330 Md. 726, 739, 625 A.2d 1005 (1993); *Clea v. City of Baltimore,* 312 Md. 662, 678, 541 A.2d 1303 (1988).

When a motion for summary judgment is filed, the opposing party may not simply claim that there are facts in dispute. In order to controvert such a motion, "the opposing party must proffer material facts which would be admissible in evidence." *Seaboard Surety Co. v. Richard F. Kline, Inc.,* 91 Md.App. 236, 243, 603 A.2d 1357 (1992). Mere conclusory denials or

allegations will not suffice. *Id.* As the Court stated in *Beatty,* "[T]he mere existence of a scintilla of evidence in support of the plaintiff's claim is insufficient to preclude the grant of summary judgment...." *Beatty,* 330 Md. at 738, 625 A.2d 1005.

In our view, the trial court correctly granted the Bank's Motion for Summary Judgment and properly denied the Kileys' Motion for Summary Judgment. Our analysis follows.

## FACTUAL SUMMARY

The facts are largely undisputed. In July, 1986, the Bank acquired all checking and savings accounts held by the now-defunct Baltimore Federal Financial ("BFF") at the Montgomery Mall branch. The Kileys were not married at that time, and only Mr. Kiley had an account with BFF at that branch.

Mr. Kiley's BFF account had several features that were understandably important to him: it was interest-bearing; it had no minimum balance requirement; and BFF did not charge service fees. As part of the acquisition of BFF, the Bank maintained those features.

Central to the Kileys' claim is the Bank's letter to its customers in June, 1986, which stated: "We're excited about having you as a new First National customer and want to assure you that any changes to your accounts will be to your benefit." Further, in his deposition, Mr. Kiley testified that the Bank's branch manager promised him "that if [he] left [his] account open with First National Bank of Maryland, no changes would be made to the terms and conditions of the account." [1] Mr. Kiley acknowledged in his deposition that the branch manager never expressly promised that the benefits

---

**1.** Although Mr. Kiley could not remember either the sex or name of the branch manager, he was confident that he accurately remembered the content of the discussion. No issue has been raised by the Bank as to the manager's agency status or authority.

would remain the same. He claimed, however, that the assurance was certainly "implied."

In October, 1990, the Bank attempted to change Mr. Kiley's account from an "Investment Checking" account to a "Bonus Checking" account, and sought to impose a $15.00 monthly service fee if the account fell below a minimum balance requirement. Unhappy with that proposal, Mr. Kiley met with another Bank employee and argued to her that the imposition of a fee would constitute a breach of contract. When the Bank reversed the charge and reinstated the original BFF terms, Mr. Kiley was at least temporarily appeased.

In August, 1991, after the Kileys married, Ms. Kiley was added as a party to Mr. Kiley's Bank account. At that time, the Kileys executed signature cards that advised them to "See Important Information in Rules and Regulations Governing Personal Deposit Accounts." The reverse side of each signature card also stated: "The applicant(s), whose signature(s) appears below, hereby acknowledges receipt of the Demand Deposit Disclosure Statement and the Rules and Regulations Governing Personal Deposit Accounts."

Another letter was sent on December 31, 1991 to the Bank's former BFF customers, including Mr. Kiley, notifying them of the Bank's intention to implement changes to the terms of their accounts. The letter advised that, as former BFF customers, their accounts differed from those of other Bank customers and, because of rising business costs, it was necessary to change the pricing of some services, as well as the types of accounts offered.[2] To Mr. Kiley's dismay, none of the proposed types of accounts included an interest-bearing, no-minimum-balance, no-service-fee program, such as Mr. Kiley had enjoyed. As a result, Mr. Kiley refused to accept the proposed changes, and demanded that the Bank continue the Kileys' account on the identical terms.

---

2. In the notice, the Bank offered an interest-bearing, no-service-fee option that required a minimum balance of $1,000. It also offered a non-interest-bearing personal checking account with no service charges, with a required minimum daily balance of $600.00.

On February 1, 1992, the Bank implemented the minimum balance requirements and service fees outlined in its letter. The Kileys again objected to the changes in their account. When the Bank and the Kileys were unable to reach a mutually satisfactory resolution, the Bank advised the Kileys of their option to close their account. On April 15, 1992, after unsuccessful attempts to resolve the dispute, the Bank requested the Kileys to close their account. The Bank's letter stated:

[W]e now would like you to close your account with First National Bank of Maryland by April 24, 1992. If you do not close your account by that date, we will close your account and mail you a cashier's check for the remaining balance. Please be advised not to write any more checks or they will be returned "Account Closed."

Although the Kileys acknowledged receipt of the notice, they made no attempt to close the account or to open a new one elsewhere. Nor did they ask their employers to stop direct deposits to their bank account. Moreover, notwithstanding the Bank's notice, they continued to write checks drawn on their account.

On April 29, 1992, the Bank mailed a check to the Kileys in the amount of $1,121.07, representing their remaining balance. The Bank also notified them that the account had been closed. Following issuance of the check on April 29, 1992, the Bank placed a hold on the Kileys' account in order to afford them an opportunity to cash the check. The Bank rejected Mr. Kiley's direct deposit from his employer on April 30, 1992. On May 4, 1992, however, Ms. Kiley's electronic deposit in the amount of $877.06 was inadvertently accepted and credited to the Kileys' account.

From April 30, 1992 until May 8, 1992, the Bank paid two checks written by appellants. One check, in the amount of $636.36, was paid to a creditor on April 30, 1992; the other, in

the sum of $40.00 [3], was paid on May 5, 1992, out of the reserved money. But the Kileys' mortgage check in the amount of $1,111.87, written on April 30, 1992, was rejected because, after deducting the funds on hold, the check exceeded the remaining balance in the Kileys' account. On or about May 15, 1992, eight days after the Kileys cashed the Bank check for $1,121.07, the Bank sent another draft to the Kileys for $198.46, representing the remaining funds in the account, plus a refund for a $2.00 service fee. The Bank actually closed the account on May 18, 1992, when the second cashier's check was presented for payment.

## DISCUSSION

### I. The Operative Contract

■ To support their claims as to breach of contract, promissory estoppel, and waiver, the Kileys rely, primarily, on the Bank's conduct prior to the time that Ms. Kiley was added to the account. We conclude that, when Ms. Kiley joined the account, all of the parties agreed to specific contractual terms that superseded any other contract terms. Further, the Bank never breached the operative contract terms. Our holding renders irrelevant the Bank's conduct prior to August, 1991 with respect to these particular claims. We explain.

■ The Kileys' relationship with the Bank was contractual in nature. *See Gordon, Feinblatt, Rothman, Hoffberger & Hollander v. Gerhold,* 90 Md.App. 360, 376, 600 A.2d 1194 (1992) [4] ("A bank and its customers enjoy a debtor/creditor relationship in which the rights and liabilities of each are contractual."). As the Court said in *University Nat'l Bank v. Wolfe,* 279 Md. 512, 514, 369 A.2d 570 (1977), "[t]he relationship [between a bank and its customer], which has been universally recognized, and consistently followed in this State

---

3. The $40.00 check, written to the Kileys' housekeeper, was initially dishonored. That check was resubmitted and honored after Ms. Kiley's direct deposit was credited to the account.

4. The Hollander in the referenced case is not a relative of the author.

to the present time, is that of debtor and creditor, with the rights between the parties considered as contractual, and derived by implication from the banking relationship unless modified by the parties." (Citation omitted).

After the Kileys married in August, 1991, they executed new signature cards with the Bank. A signature card may constitute a contract between a bank and its customer. *Fleming v. Bank of Va.*, 231 Va. 299, 343 S.E.2d 341, 344 (1986) ("The signature card constituted the contract between the parties and, subject to the statutory schemes, regulates their rights and duties."); *Fed. Deposit Ins. Corp. v. West*, 244 Ga. 396, 260 S.E.2d 89, 91 (1979) ("[T]he signature card and the checks drawn against the account are the contract documents between the bank and the customer."); *Chickerneo v. Soc'y Nat'l Bank of Cleveland*, 58 Ohio St.2d 315, 390 N.E.2d 1183, 1185 (1979). In this case, the signature cards specifically referred to the Bank's Rules and Regulations and, in executing the signature cards, appellants accepted those Rules and Regulations. *Dietrich v. Chem. Bank*, 115 Misc.2d 713, 454 N.Y.S.2d 490, 491 (Sup.Ct.1981), *aff'd*, 92 A.D.2d 786, 459 N.Y.S.2d 1016 (1983) (plaintiff may not claim she did not receive Bank's rules and regulations because she signed signature card acknowledging receipt). Collectively, the signature cards and the Rules and Regulations constituted the contract between the Bank and the Kileys. *See* 5(a) *Michie on Banks & Banking*, Ch. 9, § 1, at 30 (1994 Repl.Vol.) ("Michie") ("A 'signature card' is a contract which creates a savings account or checking account...."). Assuming, *arguendo*, that Mr. Kiley ever had a contract with the Bank to maintain, perpetually, the original BFF terms, once Ms. Kiley was added to the account, the Kileys either created a new contract with the Bank or modified their original contract.

In *Dahl v. Brunswick Corp.*, 277 Md. 471, 356 A.2d 221 (1976), the Court set forth the elements of novation. It said:

"A 'novation' is a new contractual relation made with intent to extinguish a contract already in existence. It 'contains four essential requisites: (1) a previous valid obligation; (2) the agreement of all the parties to the new contract; (3) the

validity of such new contract, and (4) the extinguishment of the old contract, by the substitution of the new one.'"

*Id.* at 481, 356 A.2d 221 (quoting *I.W. Berman Properties v. Porter Bros., Inc.,* 276 Md. 1, 7, 344 A.2d 65 (1975); citations omitted).

Whether the parties here entered into a novation or simply modified the original contract, they nonetheless agreed to be bound by the Bank's Rules and Regulations. Accordingly, whatever the Bank may have done *prior* to August, 1991 would have no legal significance. Moreover, the Bank's conduct *after* that point in time must be considered in light of the operative contract terms. We are of the view that the Bank's actions *after* Ms. Kiley joined the account complied with the Rules and Regulations.

The Rules and Regulations provide, in pertinent part, as follows:

*General Information*

1. Welcome to the First National Bank of Maryland

This Agreement has been prepared to explain the terms and conditions of the deposit account(s) you have opened with The First National Bank of Maryland (Bank).

The Rules and Regulations set forth in this Agreement, together with any deposit agreements, funds availability statements, policies of the Bank set forth in the Branch Operations Manual, schedules of service charges, and brochure material describing deposit accounts (collectively The "Rules and Regulations"), govern all deposit accounts offered by the Bank. *You, as a deposit customer, and the Bank agree to abide by the Rules and Regulations outlined in these various materials....*

\* \* \* \* \* \*

4. Deposits to Accounts

Section A—General Deposit Rules

In receiving items for deposit or collection, we act as your collecting agent and assume no responsibility beyond the

exercise of due care. *For good reason, we can refuse, limit, or return any deposit.*

\* \* \* \* \* \*

7. Service Charges

We may charge you for the various services provided in connection with your accounts. *These prices ... may be changed from time to time, at our option, upon reasonable notice.*

\* \* \* \* \* \*

11. Closing the Account

You or the Bank can close an account in compliance with whatever restrictions on length of deposit or notice of withdrawal might be imposed by Federal Regulations or by the practice of the Bank for that account.

\* \* \* \* \* \*

*Savings and Money Market Deposit Accounts*

(2) Payment of Interest

Interest payments, if not withdrawn, will bear interest the same as a deposit of cash. All interest rates applicable to deposit accounts are annual interest rates unless otherwise specified. Interest on *interest-bearing checking,* savings and money market accounts is calculated and accrued daily and credited monthly at the end of the monthly cycle, if the account remains open through the last day of the monthly cycle. Accounts closed between interest payment periods will not receive interest for the partial period. *We may establish a minimum balance or a minimum average balance for your account, below which a lower interest rate or no interest will be accrued or credited, or below which interest will be credited only at maturity.*

(Emphasis added).

■ Although the Bank's regulations did not address the *process* of closing an account, common law dictates that principles of good faith apply. Nevertheless, the relationship between a bank and its customer ordinarily exists "at will" and may be terminated by either party at any time. *See, e.g.,*

*Groos Nat'l Bank v. Comptroller of Currency,* 573 F.2d 889, 897 (5th Cir.1978) ("It is well established at common law that a bank may decline or terminate a deposit relationship"); *Elliot v. Capital City State Bank,* 128 Iowa 275, 103 N.W. 777, 778 (1905) (a bank "may receive a general deposit to-day, and to-morrow, for reasons of its own, it may return the amount deposited, and refuse absolutely to transact business further with such depositor."); *Chicago Marine & Fire Ins. Co. v. Stanford,* 28 Ill. 168, 173 (1862) ("If the banker finds the depositor a troublesome customer, so that the account is not a desirable one, he may tender the full amount of the deposit, and refuse to receive more, and thus close the account. . . ."). *See also,* 5(A) Michie, Ch. 9, § 9 at 55 ("[T]he relationship of banker and depositor may be terminated by the act of either or both parties.").

When the Bank proposed to change the terms of the Kileys' account, it acted in accordance with its contractual obligations. Similarly, when the Bank gave notice to close the account, it complied with the contractual terms. Any claim to the contrary must fail.

## II. *Sufficiency of Notice to Close the Account*

The Kileys contend that the Bank's notice to close was legally insufficient. The law is well settled that a bank must give reasonable notice to a customer of its intent to terminate a bank account. *Ambruster v. Nat'l Bank of Westfield,* 116 N.J.L. 122, 182 A. 613 (1935) ("A bank is not required to keep a customer's account, but it may close out an account only on reasonable notice."); 5(a) Michie, Ch. 9, § 9 at 55 ("[I]t [is] well settled that a bank is not justified in closing an account . . . without reasonable notice."). This means that a bank must give enough notice to allow a customer to protect his or her credit by making other banking arrangements. *See C–K Enterprises v. Depositors Trust Co.,* 438 A.2d 262, 265 (Me.1981) ("[R]easonable notice is such notice as would allow a customer a reasonable opportunity to protect his or her credit. . . ."); *Jaselli v. Riggs Nat'l Bank,* 36 App.D.C. 159, 169 (1911) ("It is well settled that a bank is not justified in closing

an account and dishonoring checks drawn against it without reasonable notice. The reason is obvious. The depositor is entitled to sufficient notice to enable him, in the exercise of reasonable diligence, to protect his credit.").

We observe that the Bank clearly did not furnish much notice to the Kileys to allow them to protect their credit. But we need not reach the issue of whether the notice was legally insufficient because, to the extent that the Kileys sustained injury, it was self-inflicted. The undisputed facts demonstrate that the Bank informed the Kileys on April 15, 1992 that they were to close their account by April 24, 1992. The Bank also advised appellants that, if they did not close their account by that date, the Bank would close it and mail a cashier's check to them for the remaining balance. The Bank expressly warned the Kileys not to write any more checks on the account. The Kileys never asked the Bank for additional time to make other banking arrangements, and wholly failed to make any effort to establish a new account elsewhere or to inform their employers to terminate direct deposit. At their peril, they ignored the Bank and refused by their actions to stop writing checks or to assume any responsibility to protect their own credit.

The Bank dishonored a mortgage check written on April 30, 1994, fifteen days after the Bank gave notice and after the Kileys had received a check from the Bank representing their balance in the account. If the dishonored check had been written by the Kileys before, on, or immediately after April 15, 1992—the date the Bank sent notice—and if it had been presented by the payee after the scheduled closing date, we would confront an entirely different situation. But here, the Kileys voluntarily elected to write checks when they had been informed not to do so. They erroneously argue that the consequences of these actions are the Bank's fault.

The Kileys also argue that, based on the Bank's actions after it gave notice of termination, it waived any right it had to close their account. They rely on the following facts: The Bank placed a hold on the remaining funds; it mistakenly accepted the direct deposit of Ms. Kiley's paycheck; it paid

the Kileys' subsequent drafts. In order to show waiver, however, there must be evidence of an intentional relinquishment of a known right. *Dahl v. Brunswick Corp.*, 277 Md. at 486, 356 A.2d 221; *Canaras*, 272 Md. at 360, 322 A.2d 866. It is apparent that the Bank placed a hold on the Kileys' funds as part of the process of closing their account. Although the Bank erroneously accepted one direct deposit, the Kileys actually wanted the Bank to pay the checks they had written after they received notice of the intended closure. Even in summary judgment posture, the Bank's action could not reasonably amount to waiver, and we perceive no error.

### III. The Kileys' Contract Contentions

■ As we have observed, much of the Bank's conduct on which appellants rely preceded the time when Ms. Kiley was added to the account. But even if the Bank's conduct prior to August, 1991 is relevant to the Kileys' contract-related claims, those claims cannot prevail.

Appellants claim that when the Bank acquired Mr. Kiley's BFF account in 1986, the Bank's letter to its prospective customers, as well as the statements of its employees, created an enforceable contract. The Kileys contend that the terms of the contract entitled them to a lifetime interest-bearing, no-minimum-balance, no-service-fee checking account with the Bank. They further assert that, at the time the Bank acquired Mr. Kiley's BFF account, he relied on the Bank's representations and did not establish an account with another bank.

To support their contract claim, the Kileys rely on Md.Fin. Inst.Code Ann., § 5–807(a)(1) (1992); it proscribes false or deceptive advertising and misrepresentations by a bank.[5] Because the Bank is barred by law from making misrepresentations, it follows, the Kileys say, that the Bank must have meant what it said in its letter and through its employees.

---

5. The statute provides, in pertinent part: "A banking institution may not ... [i]ssue an advertisement or make a representation that is false, misleading, or deceptive...."

The Kileys also argue that the Bank breached its contract by varying the terms of the account. Based on the doctrine of promissory estoppel, they further claim that the Bank was precluded from altering the contract terms. Alternatively, the Kileys argue that the Bank waived any rights it may have had to alter the contract because it ratified the terms in 1990.

The Kileys' contentions regarding creation of the contract, misrepresentation, breach of contract, promissory estoppel, and waiver are all without merit. We shall consider these claims in turn.

■ A contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." Richard A. Lord, 1 *Williston on Contracts* § 1:1, at 2–3 (4th ed. 1990) (hereinafter *"Williston"*). *Accord, Restatement (Second) Contracts* § 1, at 5 (1981). Mutual assent is an integral component of every contract. *Md. Supreme Corp. v. Blake Co.,* 279 Md. 531, 539, 369 A.2d 1017 (1977).

■ It is equally well established that an enforceable contract must express with definiteness and certainty the nature and extent of the parties' obligations. *Canaras v. Lift Truck Services,* 272 Md. 337, 346, 322 A.2d 866 (1974); *Robinson v. Gardiner,* 196 Md. 213, 217, 76 A.2d 354 (1950); *Reiser Co. v. Baltimore Radio Show, Inc.,* 169 Md. 306, 312, 181 A. 465 (1935). If the contract omits a term or is too vague with respect to essential terms, the contract may be invalid. *L & L Corp. v. Ammendale,* 248 Md. 380, 385, 236 A.2d 734 (1967); *see also, Schloss v. Davis,* 213 Md. 119, 123, 131 A.2d 287 (1956) (a "contract may be so vague and uncertain as to price or amount as to be unenforceable."). "Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement have often been held to prevent the creation of an enforceable contract." Joseph M. Perillo, 1 *Corbin on Contracts* § 4.1, at 525 (rev. ed. 1993) (hereinafter *"Corbin"*); *See also, Restatement (Second) Contracts, supra,* § 33(1), at 92 ("Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so

as to form a contract unless the terms of the contract are reasonably certain.").

In *Robinson v. Gardiner,* 196 Md. 213, 76 A.2d 354 (1950), the Court explained the requirement of contractual certainty.

> Of course, no action will lie upon a contract, whether written or verbal, where such a contract is vague or uncertain in its essential terms. The parties must express themselves in such terms that it can be ascertained to a reasonable degree of certainty what they mean. If the agreement be so vague and indefinite that it is not possible to collect from it the intention of the parties, it is void because neither the court nor jury could make a contract for the parties. Such a contract cannot be enforced in equity nor sued upon in law. For a contract to be legally enforceable, its language must not only be sufficiently definite to clearly inform the parties to it of what they may be called upon by its terms to do, but also must be sufficiently clear and definite in order that the courts, which may be required to enforce it, may be able to know the purpose and intention of the parties.

*Id.* at 217, 76 A.2d 354 (citations omitted).

The Bank's letter, on which appellants rely, obviously does not contain any terms. We find it quite a stretch to construe that letter as a contract. At most, it is a mere expression of intent to do an act. "[A] mere expression of intention to do an act is not an offer to do it, and a general willingness to do something on the happening of a particular event or in return for something to be received does not amount to an offer." *Blake Co.,* 279 Md. at 539, 369 A.2d 1017.

As *Corbin* has recognized, it is certainly possible to make a binding offer through a newspaper advertisement, a catalog, a placard circular, a handbill, or the like. But "[s]uch advertisements are understood to be mere requests to consider and examine and negotiate; and no one can reasonably regard them otherwise unless the circumstances are exceptional and the words used are very plain and clear." 1 *Corbin,* § 2.4, at 116–17. Ordinarily, such communications are considered "mere preliminary invitation[s]," 1 *Corbin,* § 2.4, at 122, or

"inoperative step[s] in the preliminary negotiation." 1 *Corbin,* § 2.2, at 105. Courts have understandably been reluctant to find an offer on the basis of such preliminary communications. The Bank's letter was obviously incomplete as to material terms. In the same way, Mr. Kiley has admitted that the branch manager never expressly promised anything. Based on these undisputed facts, it is difficult to transform the Bank's letter or the employee's statements into a contract.

Even assuming that the Bank's letter or the alleged statements of its employees created contractual rights, the putative contract is obviously silent as to its duration. Depending upon the intention of the parties, a contract, silent as to duration, may contemplate perpetual performance, performance for a reasonable time, or performance until the parties decide otherwise. But *Williston* and the *Restatement (Second) of Contracts* agree that, unless expressly provided, promises ordinarily are not interpreted to require perpetual performance. *Williston,* § 4:19, at 431; *Restatement (Second) Contracts,* § 33, Comment d, at 94. When courts are required to interpret such imprecise contracts, "some period short of infinity" is usually enforced. *Williston,* § 4:19, at 434. "[A]bsent a contrary intention being shown by the circumstances, [courts will] interpret a promise which does not in terms state the time of performance as intending performance in or for a reasonable time." *Id.* Similarly, if a continuing performance was anticipated, but no specific time provision was stipulated in the contract, "the contract contemplates performance for a reasonable time," and is usually terminable at any time by either party. *Id.,* § 4:19 at 442; *Restatement (2d) Contracts,* § 33.

▮ To the extent that the parties here formed a contract, silent as to duration, it would have been effective for a reasonable time. *Anne Arundel Co. v. Crofton Corp.,* 286 Md. 666, 673, 410 A.2d 228 (1980) ("In the absence of an express time for performance, a reasonable time will be implied."); *Williston,* § 4:19, at 429–48. That is the only sensible and fair

result. The Bank continued the BFF terms for over five years; such a lengthy period was certainly reasonable.

In applying the objective test to interpret a contract, the Court of Appeals has said: " 'The true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.' " *Cloverland Farms Dairy, Inc. v. Fry,* 322 Md. 367, 373, 587 A.2d 527 (1991) (quoting *Kasten Constr. v. Rod Enterprises,* 268 Md. 318, 329, 301 A.2d 12 (1973)). We also find pertinent here the Court's analysis in *Canaras v. Lift Truck Services:* "Where language of a contract is open to an interpretation which is reasonable and in accordance with the general purpose of the parties, the hardship of a different interpretation is strong ground for belief that such a meaning was not intended." 272 Md. at 357, 322 A.2d 866 (quoting *Sorensen v. J.H. Lawrence Co.,* 197 Md. 331, 339, 79 A.2d 382 (1951)). In *Canaras,* the Court determined that it was unreasonable to interpret an agreement to hold that the parties intended an employer-employee relationship for a six year term. Instead, the Court concluded that the interpretation of a one-year term was more reasonable. *Id.*

The Kileys' estoppel argument is equally unavailing, and was properly rejected by the trial court. At his deposition, Mr. Kiley testified that "[he] would have closed the account, but for the promise to [him] that if [he] didn't close the account, [his] account would continue with the same terms that [he] had with BFF."

It is unclear whether Maryland continues to adhere to the more stringent formulation of promissory estoppel, as set forth in the original *Restatement of Contracts,* or now follows the more flexible view found in the *Restatement (Second) Contracts. See Union Trust Co. of Md. v. Charter Medical Corp.,* 663 F.Supp. 175, 178 n. 4 (D.Md.1986) *aff'd w/o opinion,* 823 F.2d 548 (4th Cir.1987). Neither view will change our course.

Section 90 of the original *Restatement* explains promissory estoppel as follows:

A promise which the promisor should reasonably expect to induce action or forbearance of a definite character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

Section 90(1) of the *Restatement (Second) Contracts* defines the doctrine of promissory estoppel as follows:

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

█ Under either analysis, the promisor is estopped if, at the time of making the promise, he or she should have foreseen reliance, and the enforcement of the promise is necessary to prevent injustice. *See Md. Nat'l Bank v. United Jewish Appeal Federation, Inc.,* 286 Md. 274, 282–284, 407 A.2d 1130 (1979) (interpreting original *Restatement* only); 5 *Williston,* § 8:5, at 71–117. Given that the Kileys had the benefit of the BFF terms for some five years, justice certainly does not compel application of promissory estoppel.

Even if the Bank made the promises as alleged, to succeed on a promissory estoppel claim, the Kileys had to proffer or show that the Bank anticipated that the Kileys would rely on the promise, that their reliance was reasonable, that they engaged in acts unequivocally referable to the promise, and that they suffered substantial injury as a result. *Snyder v. Snyder,* 79 Md.App. 448, 459, 558 A.2d 412, *cert. denied,* 317 Md. 511, 564 A.2d 1182 (1989). Any claimed reliance that the Kileys may have had on the alleged promise to maintain forever the original terms of the account would have been unreasonable. *See G & M Oil Co. v. Glenfed Financial Corp.,* 782 F.Supp. 1085, 1090–91 (D.Md.1991) (applying Maryland law, recovery denied on promissory estoppel grounds because

no reasonable jury could have found reasonable reliance); *Charter Medical Corp.*, 663 F.Supp. at 179. Further, in order to establish that they relied to their detriment, the Kileys would have had to show that they lost an opportunity to secure the desired banking terms, perpetually, from another institution. They never claimed that they lost such an opportunity. They claimed only that Mr. Kiley could have taken his business elsewhere.

 The Kileys' argument that the Bank waived any rights it had to change the terms of the contract when it supposedly "ratified" the existing terms in 1990 is also without merit. In *Dahl v. Brunswick Corp.*, 277 Md. 471, 356 A.2d 221 (1976), the Court explained the concept of waiver:

> "A waiver is the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right, and may result from an express agreement or be inferred from circumstances. '[A]cts relied upon as constituting a waiver of the provisions' of a contract must be inconsistent with an intention to insist upon enforcing such provisions."

*Id.* at 486, 356 A.2d 221 (quoting *BarGale Industries v. Robert Realty Co., Inc.*, 275 Md. 638, 643–44, 343 A.2d 529 (1975)); *see also, Canaras*, 272 Md. at 360, 322 A.2d 866; *Food Fair Stores, Inc. v. Blumberg*, 234 Md. 521, 531, 200 A.2d 166 (1964). Even in a summary judgment posture, the Bank's decision to reverse a service charge in 1990 cannot be construed as a clear intention to relinquish forever a right to alter the terms of the account. The Kileys' waiver argument was correctly rejected by the trial court.

 The Kileys also cannot succeed on the basis of their false advertising or misrepresentation contentions. As we have observed, this argument was predicated on the Bank's letter of June, 1986. The contention was advanced solely to buttress the contract claim, so that appellants did not allege an independent claim of false or deceptive advertising, premised either on consumer protection laws or state or federal banking regulations.

Appellants have not directed us to any Maryland cases involving deceptive advertising claims with facts similar to those in the case *sub judice*. We have not uncovered any Maryland cases on point. Our research reveals that the case of *Giummo v. Citibank, N.A.,* 107 Misc.2d 895, 436 N.Y.S.2d 172 (1981), though facially similar to the case *sub judice*, is readily distinguishable.

In *Giummo*, Citibank conducted a "Fire Sale Promotion" in 1978 and offered free checking to its new customers who opened Citibank checking and savings accounts in conjunction with lines of credit. The offer was advertised by signs placed in branch windows and on counters at the bank. In response to the promotion, plaintiff opened an account. But, in August, 1979, Citibank decided to terminate its free checking privileges and imposed a monthly service fee. Thereafter, plaintiff sued Citibank, claiming the bank fraudulently misrepresented the nature of its free checking account offer by not disclosing its reserved right to terminate the account at its own discretion.

The New York court agreed and said that "time or amount requirements for interest rates on deposits ... must be 'clearly and conspicuously stated' in all advertisements, 12 CFR 217.6(d), (e), and must be 'expressly brought to the attention of the customer.' 12 CFR § 217.4(e)." *Id.* 436 N.Y.S.2d at 173–174. The court further articulated that " '[n]o member bank shall make any advertisement, announcement, or solicitation ... that is inaccurate or misleading or that misrepresents its deposit contracts.' " *Id.* (quoting 12 C.F.R. § 217.6(g), removed effective March 3, 1993). *See also,* Md. Com.Law II Code Ann. § 13–301 (1990). As the bank failed to comply, the court awarded nine dollars in compensatory damages for the service charges incurred by the plaintiff.

The factual distinctions between *Giummo* and the instant matter are noteworthy. First, the Bank's letter of June, 1986 cannot reasonably be construed as an advertisement (*see* discussion, *supra*), and the Kileys do not even argue that it was an advertisement. Instead, the Kileys claim that the

letter itself constitutes a contract or otherwise supports their claim of an oral agreement. Second, in *Giummo*, the bank changed the account terms after only 15 months. In contrast, the Kileys enjoyed the favorable terms for over five years. Third, in the case *sub judice*, if the Kileys and the Bank had a contract in 1986, the parties mutually changed the terms when Ms. Kiley was added to the account in 1991. At that time, the Bank expressly disclosed its reserved right to change certain terms, as discussed *infra*. Finally, in *Giummo*, the plaintiff claimed that she received no notice of the proposed change in terms, but the Kileys make no such claim here. Thus, *Giummo* is inapplicable here.

### IV. Federal Statutes

The Kileys claim that the Expedited Funds Availability Act ("EFAA"), 12 U.S.C. § 4001–§ 4010 (1988 & Supp. 1993), and 12 C.F.R. § 229.18 (1994), along with the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693 (1988 & Supp.1992), and 12 C.F.R. § 205 (1993), required the Bank to provide at least 21 days of notice before closing a customer's account. The Kileys' reliance on these statutes is misplaced.

The EFAA regulates, *inter alia*, the time when banks must make deposit funds available for withdrawal and governs certain disclosure requirements. Specifically, banks must send notice to holders of consumer accounts at least thirty days before implementing a change to a bank's policy regarding availability of deposits. 12 C.F.R. § 229.18(e). The EFAA, however, does not address the notification needed to express an intent to close an account and therefore is not relevant here.

Nor does the EFTA control the length of notice necessary to close an account. Rather, it delineates the rights and liabilities of users of electronic fund transfer systems. 12 C.F.R. § 205.1. According to the EFTA, institutions must disclose certain terms and conditions, such as a summary of the consumer's liability, important telephone numbers, the institution's business hours, the types of transfers a customer

may make, and a summary of the institution's liabilities. 12 C.F.R. § 205.7. It also outlines the procedure for changing terms.

> A financial institution shall mail or deliver a written notice to the consumer at least 21 days before the effective date of any change in a term or condition required to be disclosed under § 205.7(a) if the change would result in increased fees or charges, increased liability for the consumer, fewer types of available electronic transfers, or stricter limitations on the frequency or dollar amounts of transfers.

12 C.F.R. § 205.8(a).

### V. Tort Claims

■■■ The court entered summary judgment in favor of the Bank on all counts.[6] On appeal, the Kileys pursue only the defamation and wrongful dishonor claims. As to the tort claims, the Bank argued in its motion that it was entitled to summary judgment because it properly dishonored checks written after the "duly announced closure date," and the Kileys failed to mitigate alleged damages. In granting summary judgment, the trial court did not specify which of the Bank's arguments it relied upon in granting the motion.

The Bank dishonored two of the Kileys' checks because of insufficient funds in the account. The Kileys claim that these items were properly payable, and consequently, the Bank is liable for damages.

Maryland recognizes the tort of wrongful dishonor based on Md.Com.Law I Code Ann., § 4–402 (1992). *Boggs v. Citizens Bank & Trust Co.*, 32 Md.App. 500, 501, 363 A.2d 247 (1976). Section 4–402 provides that "[a] payor bank is liable to its customer for damages proximately caused by the wrongful dishonor of an item." An item is dishonored when present-ment is duly made and acceptance or payment is refused.

---

**6.** The Kileys' initial complaint contained seven tort claims, including claims for conversion, tortious interference with plaintiff's paycheck, tortious interference with contract, wrongful dishonor, slander, libel, and intentional infliction of emotional distress.

Md. *Com.Law I Code Ann.* § 3–507. The dishonor is wrong-
ful when the "bank's refusal is not justifiable pursuant to the
Code or an accepted course of dealing with the customer or a
recognized usage of trade." *Wright v. Comm'l & Sav. Bank,*
297 Md. 148, 158, 464 A.2d 1080 (1983).

The obligation of a bank to pay a customer's checks, or its
right to refuse payment, depends upon the state of the cus-
tomer's account at the time of presentment. *See* 10 Am.
Jur.2d *Banks* § 571, at 542–43 (1963 & supp.1994). Wrongful
dishonor does not apply to "justified dishonor." 5(A) Michie,
Ch. 9, § 232, at 903–08 ("[A] bank is under no legal obligation
to pay the check of a depositor who has not money to his
credit on deposit sufficient to meet the same, and its nonpay-
ment by the bank gives rise to no claim for damages. . . ."). 
Accordingly, if there are insufficient funds in the customer's
account, a bank may rightfully refuse payment.

As we have seen, the Bank attempted to close the Kileys'
account on April 29, 1992, and issued a check to the Kileys in
an amount representing the balance of their account. The
Bank then placed a hold on the account so that the check
could be cashed. Yet the Kileys continued to write checks on
the account, including one payable to their housekeeper for
$40.00, and another payable to Marine Midland Mortgage in
the amount of $1,111.87, which was presented after May 1,
1992. The checks were not wrongfully dishonored; they were
properly rejected due to insufficient funds at the time of
presentation.

 Related to the Kileys' wrongful dishonor claim is
their assertion that the Bank "slandered" them when it re-
fused to honor the check to the housekeeper, and "libeled"
them when it dishonored the mortgage check and marked it
"returned for insufficient funds."

> To recover for defamation, a plaintiff must ordinarily estab-
> lish that the defendant made a defamatory statement to a
> third person; that the statement was false; that the defen-
> dant was legally at fault in making the statement; and that
> the plaintiff thereby suffered harm. . . . A defamatory

statement is one which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with that person.

*Rosenberg v. Helinski,* 328 Md. 664, 675, 616 A.2d 866 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 3041, 125 L.Ed.2d 727. *See also, Metromedia, Inc. v. Hillman,* 285 Md. 161, 172, 400 A.2d 1117 (1979).

The undisputed evidence does not support the defamation claims. The Kileys' defamation claims fail because the communications in question were not false. To the contrary, appellants' funds were insufficient to cover the checks.

JUDGMENT AFFIRMED; APPELLANTS TO PAY THE COSTS.