915 A.2d 462

Shawn R. HARBY, Substitute Guardian of the
Property of Donavan Marquese BROOKS

v.

WACHOVIA BANK, N.A.

No. 2758, Sept. Term, 2005.

Court of Special Appeals of Maryland.

Jan. 26, 2007.

Shawn R. Harby, Baltimore, for appellant.

Renita L. Collins (J. Preston Turner, on brief), Towson, for appellee.

Panel ADKINS, WOODWARD, CHARLES E. MOYLAN, JR., (Retired, Specially Assigned) JJ.

ADKINS, J.

"No acceptance" and "no consideration" are the twin defenses asserted by appellant Shawn R. Harby, substitute guardian of the property of Donavan Marquese Brooks, to the arbitra-

tion clause in appellee Wachovia Bank, N.A.'s depositary agreement. Like the Circuit Court for Baltimore City, we find no merit in either defense.

## FACTS AND LEGAL PROCEEDINGS

On July 22, 2004, Candace Edwards opened an account at a Wachovia branch office in Baltimore. Acting as the court-appointed guardian of the property of her minor son Donavan Marquese Brooks, Edwards presented a check for $100,000, which represented the proceeds of an insurance policy on the life of Brooks' father.

At the bank, Wachovia employee Ralph Thomas, Jr. assisted Edwards in opening this account. Thomas reports that Edwards denied that the court had issued any order regarding the account, despite the court's order directing that Edwards "shall deposit the inheritance proceeds and any other case assets in an insured financial institution as defined in Md.Code Ann. Estates and Trusts Section 13–301(h)(1991), with withdrawals only upon Court Order[.]" Edwards made a number of withdrawals from the account, without court approval.[1]

To open the account, Edwards signed a Customer Access Agreement (the Access Agreement). Next to her signature was the following:

**Acceptance of Terms and Conditions:**

I agree to be bound by the terms and conditions, including, but not limited to Wachovia's Deposit Agreement and Disclosures, applicable to each product or service which I

---

1. According to Harby, among the checks drawn on the account under Edwards' signature were checks payable to cash ($20,000), Richard Auto Sales ($12,072.75), Jean C.F. Smith ($6,800), Wendy Smith Barlou ($3,000), and Joan Wayne Smith ($10,000). Withdrawals by Edwards also were made in the amounts of $7,000, $2,500, and $700. In addition to these unauthorized checks, Edwards used account funds to make unauthorized purchases from Cingular ($102.86), Walmart ($1,560.03), ExxonMobil ($19.46), Avon ($225.66), Royal Pizza Wings ($20), Best Buy ($1,464,98), Airtran ($158.20), Cardtronic ($81.98), State Farm Insurance ($45.38), and Innovus ($202.50). Many of these withdrawals and purchases occurred within the first month after the account was opened.

obtain from Wachovia now or in the future, which terms and conditions will be provided to me. I also agree to pay all fees associated with such products, accounts and services in accordance with the fee schedules which will be provided to me by Wachovia.

At the time she opened the account Edwards also received the Deposit Agreement and Disclosures for Personal Accounts (the Deposit Agreement), effective January 1, 2004. This contains the following arbitration clause:

25. **Arbitration of Disputes/Waiver of Jury Trial and Participation in Class Actions.** If either you or we request, any irresolvable dispute or claim concerning your account or your relationship to us will be decided by the binding arbitration under the expedited procedures of the Commercial Financial Disputes Arbitration Rules of the American Arbitration Association (AAA), and Title 9 of the U.S.Code. Arbitration hearings will be held in the city where the dispute occurred or where mutually agreed. A single arbitrator will be appointed by the AAA and will be a retired judge or attorney with experience or knowledge in banking transactions. A court may enter a judgment on the award.

To the extent permitted by law, a judge without a jury will decide any dispute or claim that is not submitted to binding arbitration that results in a lawsuit.

The arbitration or trial will be brought individually and not as part of a class action. If it is brought as a class action, it must proceed on an individual (non-class, non-representative) basis. YOU UNDERSTAND AND AGREE THAT YOU AND WE ARE WAIVING THE RIGHT TO A TRIAL BY JURY AND THE RIGHT TO PARTICIPATE OR BE REPRESENTED IN ANY CLASS ACTION LAWSUIT.

Edwards was removed as guardian on November 5, 2004. Appellant Harby was appointed as Substitute Guardian. Harby filed suit against both Edwards, alleging tortious conver-

sion, breach of fiduciary duty, and unjust enrichment, as well as appellee Wachovia, alleging negligence and breach of contract. In addition, Harby sought an accounting by both Edwards and Wachovia.

Wachovia filed a motion to enforce the arbitration agreement, seeking dismissal or, alternatively, a stay pending arbitration. After a hearing, the Circuit Court for Baltimore City granted the motion and stayed the lawsuit. In a written opinion, the court ruled:

> As to the argument that the agreement did not contain an agreement to arbitrate, the court concludes that this is not a correct interpretation of the agreement.... [I]t is the court's conclusion that Wachovia did not retain the unilateral power to amend or revoke the agreement without the consent of the depositor. *See Holloman v. Circuit City Stores,* 162 Md.App. 332, 873 A.2d 1261 (2005). Accordingly, the agreement did not lack mutuality and is not invalid for failure of consideration.... There being no impediment to the enforcement of the agreement to arbitrate, the court concludes that it must be enforced.

Harby noted this appeal, raising a single issue for our review:

> Did the trial court err in finding that a valid agreement to arbitrate existed between the parties?

## DISCUSSION

Harby argues that neither the Access Agreement nor the Deposit Agreement "creates a validly enforceable agreement to submit to binding arbitration" because "there was no consideration for the agreement to arbitrate, and ... no acceptance of the agreement to arbitrate either by the appellant or by the appellant's predecessor guardian." We reject both defenses.

### Principles Governing Judicial Enforcement Of Arbitration Agreements

The Court of Appeals has

described arbitration as "the process whereby parties voluntarily agree to substitute a private tribunal for the public tribunal otherwise available to them." The Maryland Uniform Arbitration Act (hereinafter, "Arbitration Act"), found in Maryland Code, §§ 3–201 through 3–234 of the Courts and Judicial Proceedings Article (1974, 2002 Repl.Vol.), "expresses the legislative policy favoring enforcement of agreements to arbitrate."

Section 3–206(a) of the Arbitration Act provides that:

A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy arising between the parties in the future is valid and enforceable, and is irrevocable, except upon grounds that exist at law or in equity for the revocation of a contract.

Section 3–207 allows parties to petition a court to compel arbitration and states:

(a) Refusal to arbitrate.-If a party to an arbitration agreement described in § 3–202 refuses to arbitrate, the other party may file a petition with a court to order arbitration.

(b) Denial of existence of arbitration agreement.-If the opposing party denies existence of an arbitration agreement, the court shall proceed expeditiously to determine if the agreement exists.

(c) Determination by court.-If the court determines that the agreement exists, it shall order arbitration. Otherwise it shall deny the petition.

The determination of whether there is an agreement to arbitrate, of course, depends on contract principles since arbitration is a matter of contract. As such, "a party cannot be required to submit any dispute to arbitration that it has not agreed to submit."

*Cheek v. United Healthcare of Mid–Atlantic, Inc.,* 378 Md. 139, 146–47, 835 A.2d 656 (2003) (citations omitted).

■ "Our focus in reviewing the trial court's order to compel arbitration extends only to a determination of the

existence of an arbitration agreement." *Holloman v. Circuit City Stores, Inc.*, 391 Md. 580, 588, 894 A.2d 547 (2006)(internal quotation marks and citations omitted).

### Acceptance

According to Harby, neither he nor Edwards accepted the arbitration clause because, although Edwards signed the Access Agreement, (1) that document does not refer to arbitration, and (2) neither guardian signed the Deposit Agreement in which the arbitration clause appears. We agree with the circuit court that this is not a bar to enforcement of the arbitration clause.

Maryland courts have recognized that a bank customer's signature on what is commonly known as a "signature card" may constitute acceptance of terms and conditions in a separate depositary agreement. In *Kiley v. First Nat'l Bank of Md.*, 102 Md.App. 317, 326–27, 649 A.2d 1145 (1994), *cert. denied*, 338 Md. 116, 656 A.2d 772, *cert. denied*, 516 U.S. 866, 116 S.Ct. 181, 133 L.Ed.2d 120 (1995), this Court held that, by executing signature cards stating that " '[t]he applicant(s), whose signature(s) appears below, hereby acknowledges receipt of the Demand Deposit Disclosure Statement and the Rules and Regulations Governing Personal Deposit Accounts[,]' " bank depositors accepted rules and regulations set forth in that separate document:

> The Kileys' relationship with the Bank was contractual in nature. As the Court said in *University Nat'l Bank v. Wolfe*, 279 Md. 512, 514, 369 A.2d 570 (1977), "[t]he relationship [between a bank and its customer] . . . is that of debtor and creditor, with the rights between the parties considered as contractual, and derived by implication from the banking relationship unless modified by the parties." (Citation omitted).

> After the Kileys married in August, 1991, they executed new signature cards with the Bank. A signature card may constitute a contract between a bank and its customer. In this case, the signature cards specifically referred to the

Bank's Rules and Regulations and, in executing the signature cards, appellants accepted those Rules and Regulations. Collectively, the signature cards and the Rules and Regulations constituted the contract between the Bank and the Kileys.

*Id.* at 326–27, 649 A.2d 1145 (citations and footnote omitted).

In *Lema v. Bank of Am., N.A.,* 375 Md. 625, 628, 638–39, 826 A.2d 504 (2003), the Court of Appeals similarly recognized that the depositor accepts the terms of a separate deposit agreement by executing signature cards stating that the accounts "shall be governed by the terms and conditions set forth in ... the Deposit Agreement." Citing *Kiley,* the Court held that "the signature cards, along with the Deposit Agreement, constitute the contract between" the depositor and the bank. *See id.* at 639, 826 A.2d 504.

Moreover, the Court of Appeals affirmed our holding in *Hartford Acc. & Indemnity Co. v. Scarlett Harbor Assocs. Ltd. P'ship,* 109 Md.App. 217, 292, 674 A.2d 106 (1996), *aff'd,* 346 Md. 122, 129, 695 A.2d 153 (1997), that the successful incorporation of an executed contract containing an arbitration clause between two parties could require arbitration between those same parties.

Applying these principles, we agree with the circuit court that this arbitration agreement is enforceable. In a substantively similar arbitration dispute, a federal appellate court reached the same conclusion. The court rejected the bank depositors' contention that they were not bound to arbitrate according to Account Rules set forth in a separate document, even though they executed signature cards stating that they agreed to be bound by these Account Rules.

The [depositors] do not dispute that they signed a signature card when they opened their deposit account with Bank One. It is clear that by signing the card they entered into a binding contract. The [depositors] do, however, argue that they did not agree to the Account Rules referenced on the signature card because they never received the Account Rules. This argument is in direct contradiction to language

on the signature card which clearly states that the signators have received the Account Rules and agree to be bound by the agreements and terms therein.

*Jureczki v. Bank One Texas, N.A.*, 75 Fed.Appx. 272, 274 (5th Cir.2003) (citation omitted). *See also Herrington v. Union Planters Bank, N.A.*, 113 F.Supp.2d 1026, 1032 (D.Miss.2000), *aff'd by unpublished op.*, 265 F.3d 1059 (5th Cir.2001)(bank depositors accepted arbitration agreement by executing signature card containing agreement to be bound by changes to deposit agreement, receiving notice, and continuing to use account). *See generally R.J. O'Brien & Assocs., Inc. v. Pipkin*, 64 F.3d 257, 260 (7th Cir.1995)(collecting cases for the proposition that "[a] contract . . . need not contain an explicit arbitration clause if it validly incorporates by reference an arbitration clause in another document"); *Jones v. Genus Credit Mgmt. Corp.*, 353 F.Supp.2d 598, 601 (D.Md.2005)(enforcing arbitration clause in document setting forth terms of debt management services provided by defendant, which was incorporated by reference into separate agreement executed by party seeking to avoid arbitration); *Isp.com, LLC v. Theising*, 805 N.E.2d 767, 776 (Ind.2004)("There is no requirement that an arbitration clause be included in all potentially relevant documents to be binding"); *Bartley, Inc. v. Jefferson Parish Sch. Bd.*, 302 So.2d 280, 282 (La.1974)(because executed construction subcontract incorporated by reference terms of general contract that contained arbitration clause, the parties "intended to be governed by its arbitration provisions").

We have no trouble applying the contract rules illustrated in *Kiley, Lema, Scarlett Harbor Assocs.*, and *Jureczki* to enforce the arbitration terms and conditions in the Deposit Agreement in this case. As in those cases, the bank customer here specifically agreed, by his signature on the Access Agreement, "to be bound by the terms and conditions" set forth in a separate but explicitly identified deposit agreement. As guardian of Brooks's property, Edwards signed the Access Agreement. By doing so, she indicated that she understood its terms and agreed to be bound by them. *See, e.g., Holloman*, 391 Md. at 595, 894 A.2d 547 ("under Mary-

land law, a party who signs a contract is presumed to have read and understood its terms and as such will be bound by its execution"). One of the explicit provisions in the Access Agreement is that Edwards accepted the conditions set forth in the Deposit Agreement, which includes the unambiguous agreement to arbitrate. Thus, Edwards accepted the arbitration clause. As Substitute Guardian, Harby is bound by the arbitration clause that Edwards accepted. See Md.Code, § 13–220(b)(3) of the Estates and Trusts Article.

■ We are not persuaded otherwise by the cases Harby cites in support of his contention that acceptance cannot be premised upon the Access Agreement because it does not specifically identify arbitration as one of the terms and conditions to which Edwards was agreeing.[2] We have not been cited to any authority that would require such an explicit reference to arbitration in a bank's "signature card." Harby's reliance on *Shaffer v. ACS Gov't Servs., Inc.,* 321 F.Supp.2d 682 (D.Md.2004), for that proposition is misplaced.

In that case, an employer argued that its former employee accepted an arbitration clause in its employee handbook, by signing a document indicating that he had received and agreed to be bound by the polices and practices set forth in that handbook. *See id.* at 686–87. The federal district court was unwilling to bind Plaintiff to arbitration remedy merely because he acknowledged receiving an employee handbook containing seven (7) lines that discuss a dispute resolution program. In fact, the section discussing the DRP conspicuously **fails to mention that employees are required to submit employment-related matters to arbitration.** As

---

**2.** Other cases cited by Harby do not support this argument. To the contrary, these merely establish that bank contracts containing an arbitration agreement are enforceable between the parties. *See Walther v. Sovereign Bank,* 386 Md. 412, 428, 872 A.2d 735 (2005)(enforceable arbitration clause in mortgage was underlined and placed above signatures); *Coots v. Wachovia Securities, Inc.,* 304 F.Supp.2d 694, 697–98 (2003), *vacated and remanded on jurisdictional grounds,* 114 Fed.Appx. 586 (4th Cir.2004)(arbitration clause in Wachovia's Customer Agreement was not enforceable against non-signatories).

such, this Court finds that the signed employee handbook acknowledgment does not constitute acceptance of an agreement to arbitrate.

*Id.* at 687 (emphasis added). In contrast to the vague dispute resolution language in the employee handbook in *Shaffer*,[3] the arbitration clause in the Deposit Agreement clearly states that arbitration is required if either party requests it.

## Consideration

■ Harby argues alternatively that the arbitration agreement is unenforceable for lack of consideration, because it remains subject to modification by Wachovia, under the terms of the Deposit Agreement. Citing *Cheek v. United Healthcare of the Mid–Atlantic, Inc.,* 378 Md. 139, 835 A.2d 656 (2003), Harby contends that the following language in paragraph 31 makes the promise to arbitrate in paragraph 25 "illusory" and therefore unenforceable:

31. **Changing this Agreement.** We [Wachovia] have the right to change the terms of this Agreement and the fees, charges and other terms and conditions described in other documents incorporated by reference. We will notify you in writing at least thirty calendar days before the change will take effect if the change is not in your favor. . . . We reserve the right to waive the enforcement of any of the terms of this Agreement with respect to any transaction or series of transactions. Any such waiver will not affect our right to enforce any of our rights with respect to . . . later transactions with you. Whether we enforce or waive

---

**3.** The pertinent language in the employee handbook given to Shaffer was as follows:

[Employer] had adopted a Dispute Resolution Plan as the exclusive means of resolving the majority of work-related problems. Its purpose is to give employees flexible options for airing and settling almost every kind of workplace conflict . . . from minor, everyday misunderstandings to violations of legally protected rights. For any questions regarding this process or to file a complaint please contact Human Resources or the ombudsman . . . .

*Shaffer v. ACS Gov't Servs., Inc.,* 321 F.Supp.2d 682, 687 (D.Md.2004).

our rights does not obligate us to enforce or waive similar rights in the future, nor will such waiver modify this Agreement.

In *Cheek,* the employer offered Cheek a senior sales executive position, by letter stating, *inter alia,* "that enclosed with it were 'summaries of the ... Arbitration Policy which are conditions of your employment.'" *See id.* Cheek accepted the letter offer, replying that "'[a]ll of the terms in your employment letter are amenable to me.'" *Id.* at 142, 835 A.2d 656. On his first day, Cheek received a copy of the Employee Handbook, which summarized the company's arbitration policy and stated that "arbitration 'is the final, exclusive and required forum for the resolution of all employment related disputes[.]'" *See id.* But the summary of the arbitration policy also stated that the employer could unilaterally revoke or amend it.

In refusing to enforce the arbitration clause, the Court of Appeals reviewed some principles governing contract consideration:

A promise becomes consideration for another promise only when it constitutes a binding obligation. Without a binding obligation, sufficient consideration does not exist to support a legally enforceable agreement. *See Tyler v. Capitol Indemnity Ins. Co.,* 206 Md. 129, 134, 110 A.2d 528 (1955)(recognizing that "'If [an] option goes so far as to render illusory the promise of the party given the option, there is indeed no sufficient consideration, and therefore no contract....'") (quoting 1 *Williston on Contracts,* § 141 (Rev. Ed.)). *See also Restatement of Contracts* 2d § 77 cmt. a (1981)("Where the apparent assurance of performance is illusory, it is not consideration for a return promise.")

An "illusory promise" appears to be a promise, but it does not actually bind or obligate the promisor to anything. An illusory promise is composed of "words in a promissory form that promise nothing." *Corbin on Contracts* § 5.28 (2003). "They do not purport to put any limitation on the freedom

of the alleged promisor. If A makes an illusory promise, A's words leave A's future action subject to A's own future whim, just as it would have been had A said nothing at all." *Id.*

*Id.* at 147–49, 835 A.2d 656 (some citations omitted).

The *Cheek* Court refused to enforce the arbitration policy because the employer's "promise to arbitrate was illusory." *See id.* at 141, 835 A.2d 656. Judge Battaglia explained why:

> United initiated the arbitration with Cheek; it has not revoked nor in any way altered the Arbitration Policy with Cheek at any time. Nonetheless, **the fact that "United HealthCare reserves the right to alter, amend, modify, or revoke the [Arbitration] Policy at its sole and absolute discretion at any time with or without notice" creates no real promise, and therefore, insufficient consideration to support an enforceable agreement to arbitrate.** Indeed, the plain and unambiguous language of the clause appears to allow United to revoke the Employment Arbitration Policy even after arbitration is invoked, and even after a decision is rendered, because United can "revoke" the Policy "at any time." Thus, we conclude that United's "promise" to arbitrate employment disputes is entirely illusory, and therefore, no real promise at all.

*Id.* at 149, 835 A.2d 656 (emphasis added and footnote omitted).

Three years after *Cheek*, the Court of Appeals "delineat[ed] the scope and application of" that decision, in *Holloman v. Circuit City Stores, Inc.*, 391 Md. 580, 582, 894 A.2d 547 (2006). Holloman's former employer invoked an arbitration clause that was described in her employment application as " 'requir[ing] you and Circuit City to arbitrate certain legal disputes related to your application for employment or employment with Circuit City.' " *Id.* at 583, 894 A.2d 547. The employment application also stated that " 'Circuit City will consider your application only if this agreement is signed.' " *Id.* But, in contrast to the agreement in *Cheek*, the arbitration

agreement could not be revoked or amended at any time the employer desired.

Again writing for the Court, Judge Battaglia relied on this distinction as reason to enforce that arbitration agreement:

> **Unlike [the employer] in *Cheek*, Circuit City does not have unfettered discretion to alter or rescind the arbitration agreement without notice or consent.** Rather, under the terms of the agreement, Circuit City is bound to the terms of the arbitration agreement for 364 days, must provide thirty-days notice prior to any modification and may only alter the agreement on a single day out of the year to become effective during the next day. Holloman, under these terms, could have the opportunity to arbitrate any "grievance" with Circuit City under the terms explicated during the 30–day window without fear of recission or alteration by Circuit City. **We find these limitations to be adequate to create a binding obligation on Circuit City to submit to arbitration, such that Circuit City's promise to arbitrate under the arbitration agreement constitutes consideration, and the agreement is enforceable.**

*Id.* at 592–93, 894 A.2d 547 (emphasis added).

In affirming our decision to enforce the arbitration agreement, the Court of Appeals rejected Holloman's argument that *Cheek* stands for the proposition that " 'notice does not provide consideration in Maryland.' " *See id.* at 592, 894 A.2d 547. "On the contrary," the *Holloman* Court ruled, "our reasoning in *Cheek* indicates that the arbitration agreement at issue in that case was unenforceable because [the employer] was not bound to arbitrate and could 'opt out' of the arbitration process at any time, even after the process was initiated— or even completed." *Id.*

In this case, as in *Holloman*, there is a promise to adhere to the terms of the original arbitration clause and to give 30 days' notice of any change in that provision. In *Holloman*, as an example of adequate consideration, this Court cited the following illustration from the *Restatement (Second) of Contracts* § 77:

A promises B to act as B's agent for three years on certain terms, starting immediately; B agrees that A may so act, but reserves the power to terminate the agreement on 30 days notice. B's agreement is consideration, since he promises to continue the agency for at least 30 days.

*Holloman,* 162 Md.App. at 340, 873 A.2d 1261.

We find no substantive difference between Wachovia's agreement in this instance that any proposed modification cannot "take effect" until 30 days after notice has been given and Sovereign Bank's agreement in *Holloman* that "all claims arising before the alteration or termination" of the arbitration agreement "shall be subject to" that agreement. The undisputed meaning of the contract is that Wachovia was obligated to arbitrate on the terms set forth in the Deposit Agreement for at least 30 days following Edwards' opening of the Wachovia account. We agree with the circuit court that this constitutes mutual consideration within the purview of *Holloman.*

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**