*Jabari Morese Lyles v. Santander Consumer USA Inc.,* No. 1459, September Term, 2023.
Opinion by Graeff, J.

**ARBITRATION — CONTRACT FORMATION — CONTRACT ASSIGNMENT — INTEGRATION CLAUSE**

The circuit court did not err in compelling arbitration where the parties mutually agreed to arbitrate their disputes. Mr. Lyles agreed to arbitrate with the dealer based on the provision in the Buyer's Order stating that the parties agreed to arbitrate any dispute. If a provision compelling arbitration is unambiguous and the parties clearly agree to arbitration, even a sparse arbitration clause will be enforced. Moreover, the Buyer's Order referred to a separate arbitration agreement, which specified arbitration terms. Although there was no evidence that Mr. Lyles signed the form the dealer routinely used, Mr. Lyles signed a statement that he had read and understood the terms of contract, including a provision incorporating the separate arbitration agreement. Under these circumstances, Mr. Lyles is presumed to have been on notice of the agreement to arbitrate, and he is estopped from denying his obligation to arbitrate with the dealer.

Santander Consumer USA Inc. ("Santander"), as assignee from the dealer of the Retail Sales Installment Contract ("RISC"), could compel arbitration. An assignee generally stands in the shoes of its assignor. Santander, as the assignee of the RISC in this case, had the same rights and responsibilities and could raise all the same claims or defenses as the dealer. Although the RISC did not mention arbitration, a Buyer's Order and a RISC can be construed together as a single agreement if the language of the documents indicate that intention. The language of the Buyer's Order and the RISC here showed that the parties intended the documents to be read together as part of the same transaction, allowing Santander to enforce the arbitration agreement in the Buyer's Order for disputes arising under the RISC.

Circuit Court for Baltimore City
Case No. 24-C-21-000061

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1459

September Term, 2023

_____

JABARI MORESE LYLES

v.

SANTANDER CONSUMER USA INC.

_____

Graeff,
Tang,
Eyler, Deborah S.
    (Senior Judge, Specially Assigned)

JJ.

_____

Opinion by Graeff, J.

_____

Filed: October 31, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

This appeal arises from a class action complaint filed by Jabari Lyles, appellant, in the Circuit Court for Baltimore City, against Santander Consumer USA Inc. ("Santander"), appellee. The complaint alleged breach of contract and violations of the Maryland Credit Grantor Closed End Credit Provisions ("CLEC"), Md. Code Ann., Com. Law ("CL") §§ 12-1001 to 1030 (2023 Supp.), in connection with Santander's practice of collecting convenience fees from customers. Santander filed a Motion to Compel Non-Class Arbitration and Stay the Action (the "Motion to Compel Arbitration"), which the circuit court granted.

On appeal, appellant presents three questions for this Court's review,[1] which we have consolidated into the following question:

Did the court err in granting Santander's Motion to Compel Arbitration?

For the reasons set forth below, we shall affirm the judgment of the circuit court.

---

[1] Mr. Lyles's questions presented are as follows:

1. Were either the Buyer's Order or Separate Arbitration Agreement incorporated, by reference, into the RISC *with respect to Santander?*

2. Do the Buyer's Order or Separate Arbitration Agreement independently provide *Santander* the contractual right to force Lyles to arbitration?

3. Under Maryland contract law, can a party be bound by a contract if that party did not sign the contract, was not provided a copy of the contract, and did not otherwise agree to the terms contained within the contract?

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.**

**Vehicle Purchase**

In October 2015, Mr. Lyles purchased a Ford Escape from Liberty Ford, a Maryland automobile dealership.[2] Mr. Lyles and Liberty Ford each signed two documents: (1) an order that established the vehicle purchase terms ("Buyer's Order"); and (2) a Retail Installment Sales Contract (the "RISC"), which established the vehicle financing terms. The documents were signed on the same day as part of one transaction.

The Buyer's Order listed the unpaid cash balance of the vehicle purchase as $20,657. There were two signatories to the Buyer's Order, the "DEALER OR AUTHORIZED REPRESENTATIVE," Wendell Fisher, a Liberty Ford salesman, and the "PURCHASER," Mr. Lyles. The Buyer's Order did not refer to Santander, or any other assignee, and it did not contain any language indicating that the obligation established in the Buyer's Order may be assigned to a third party. The Buyer's Order, a one-page document, contained the following provision, in bold, directly above the signature line on the front page:

> **NOTICE: SEE REVERSE SIDE AND SEPARATE ARBITRATION AGREEMENT FOR IMPORTANT INFORMATION ON YOUR RIGHTS AS TO RESOLVING DISPUTES, CONTROVERSIES OR CLAIMS ARISING FROM THIS ORDER.**

The back page of the Buyer's Order contained "Additional Terms and Conditions." Paragraph 18 of these terms and conditions stated that "[t]he above and reverse side along

---

[2] Liberty Ford is part of Deer Automotive Group, LLC.

2

with other documents signed by Purchaser in connection with this Order comprise the entire agreement affecting this purchase, and no other agreement or understanding of any nature concerning same has been made or entered into will be recognized." Paragraph 7 stated, in bold print, as follows:

> **The parties irrevocably agree that any controversy, claim or dispute arising out of or related to the purchase or the financing of this vehicle including but not limited to this Purchase Agreement or the breach thereof shall be settled by binding arbitration, pursuant to the separate Agreement to Arbitrate Disputes. However, binding arbitration will not apply to the failure of the Purchaser to provide consideration including failure to pay a note, a dishonored check, failure to provide a trade title, or failure to pay a deficiency resulting from an additional payoff on a trade. In [ ] addition, binding arbitration will not apply to Dealer's right to retake possession of the vehicle. SEE SEPARATE ARBITRATION AGREEMENT ATTACHED HERETO AND INCORPORATED BY REFERENCE HEREIN FOR SPECIFIC DETAILS.**

There is no record of a separate signed arbitration agreement between Lyles and Liberty Ford. Mr. Lyles stated that he was not presented with, and never signed, a separate arbitration agreement.

The standard Arbitration Agreement to Arbitrate Disputes (the "Separate Arbitration Agreement") allegedly used by Liberty Ford at the time of Mr. Lyles' vehicle purchase, however, stated that any disputes relating to the purchase or financing of the vehicle would be subject to binding arbitration. It provided:

> Purchaser and Dealer agree that if any controversy, claim or dispute arise out of or relates to the purchase and/or financing of the vehicle, including any negotiations or applications for credit or other dealing or interactions with the Dealership, the controversy, claim or dispute will be resolved by binding arbitration by a single arbitrator under the applicable rules of the alternative dispute resolution of the American Arbitration Association, with that arbitrator rendering a written decision with separate findings of fact and conclusions of law. The arbitrator shall be a person involved in the retail

3

automotive field having no less than five (5) years experience in such field, disinterested in this purchase, lease or financing transaction, not affiliated with the parties, and recognized as ethical and reputable.

The Separate Arbitration Agreement also specified that purchasers were waiving their right to a jury trial and class action consideration for any claims subject to arbitration:

THE PARTIES UNDERSTAND THAT THEY ARE WAIVING THEIR RIGHTS TO A TRIAL, INCLUDING BUT NOT LIMITED TO A JURY TRIAL AND CLASS CONSIDERATION OF ALL DISPUTES BETWEEN THEM NOT SPECIFICALLY EXEMPTED FROM ARBITRATION.

The RISC, which was signed the same day as the Buyer's Order, established the terms of the financing agreement for the vehicle. It provided that Mr. Lyles would make monthly loan payments in the amount of $503.52 for 72 months, for a total of $36,253.44. The RISC was signed by Mr. Lyles, the "Buyer," and Deer Automotive Group LLC, the "Seller-Creditor." The RISC stated that the seller "may assign this contract and retain its right to receive a part of the Finance Charge." Underneath the seller's signature, at the bottom of the first page of the document, the RISC stated: "Seller assigns its interest in this contract to SANTANDER CONSUMER USA (Assignee) under the terms of Seller's agreement(s) with Assignee."

The RISC also contained an integration clause, which provided, in relevant part, as follows:

This contract, along with all other documents signed by you in connection with the purchase of this vehicle, comprise the entire agreement between you and us affecting the purchase.[3] No oral agreements or understandings are binding. Upon assignment of this contract: (i) only this contract and the

_____

[3] The RISC specified that the term "us" in the contract referred to the Seller-Creditor.

4

addenda[4] to this contract comprise the entire agreement between you and the assignee relating to this contract; (ii) any change to this contract must be in writing and the assignee must sign it; and (iii) no oral changes are binding.

Mr. Lyles signed directly under this provision. There is no mention of arbitration in the RISC.

Pursuant to the assignment provision of the RISC, Mr. Lyles made monthly payments to Santander. The complaint alleged that, as of December 2020, Mr. Lyles had paid a total of $27,029.67 on the loan, and Santander claimed that he still owed $15,603.54.

## II.

### Complaint and Motion to Compel Arbitration

On January 11, 2021, Mr. Lyles filed the Class Action Complaint (the "Complaint") against Santander in the Circuit Court for Baltimore City, alleging breach of contract and violations of the CLEC due to Santander's practice of collecting convenience fees from customers who made loan payments "by phone through a live representative or through an automated system or through the internet." The named class members were all persons who entered into a RISC governed by the CLEC between October 15, 2015 and October 31, 2015, were charged a convenience fee by Santander between January 1, 2016 and January 15, 2016, and "from whom Santander collected more than the principal amount of the RISC." Mr. Lyles sought civil remedies under the CLEC, actual damages equal to the amount of the convenience fees collected, and an award of pre-judgment and post-judgment interest on all sums awarded.

---

4 No evidence of any addenda to the RISC was presented.

5

On March 4, 2021, Santander filed a Notice of Removal to the United States District Court for the District of Maryland pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2). On March 5, 2021, Santander filed a Motion to Compel Non-Class Arbitration and Stay Action, and Mr. Lyles filed a motion to remand the case to state court. On April 17, 2023, the United States District Court issued an order remanding the case to the Circuit Court for Baltimore City, concluding that the amount in controversy did not meet the five million dollar threshold for diversity jurisdiction under CAFA,[5] and denying Santander's motion to compel arbitration as moot.

Following remand to the circuit court, Santander filed a Motion to Compel Non-Class Arbitration and Stay Action and Request for Hearing. Santander argued that because Mr. Lyles signed the Buyer's Order, which included a "clear and conspicuous Arbitration Provision" applying to "any controversy, claim or dispute arising out of or relating to the purchase or the financing of this vehicle" and expressly incorporated the Separate Arbitration Agreement, he could not "reasonably argue that he was unaware that he agreed" to binding arbitration. Santander further argued that "the fact that the arbitration provision is contained in the Buyer's Order and not the RISC is immaterial under Maryland" law, which holds that the two documents should be read together as the entire agreement

---

[5] While the motion to remand was pending, Mr. Lyles filed an unopposed motion to certify a question of law related to the calculation of damages under the CLEC to the Supreme Court of Maryland. The Supreme Court of Maryland answered the certified question of law, holding that the proper damages calculation in this case was "three times the amounts of interest, fees, and charges collected in violation of CLEC." *Lyles v. Santander Consumer USA Inc.*, 478 Md. 588, 592-93 (2022). The amount in controversy in Mr. Lyles' complaint did not meet the statutory threshold under the calculation formula established by the Supreme Court of Maryland.

between the parties under the integration clause. Santander asserted that, based on the terms of the Separate Arbitration Agreement and the arbitration provision in the Buyer's Order, Lyles was prohibited from pursuing class-wide claims and must resolve any claims against Santander on an individual basis.

Santander did not produce an executed copy of a Separate Arbitration Agreement between Mr. Lyles and Liberty Ford. Instead, Santander attached, as an exhibit to its motion to compel arbitration, the Affidavit of Steven R. Freeman ("Freeman Affidavit"). Mr. Freeman, an attorney for Liberty Ford, declared that he drafted and reviewed the Separate Arbitration Agreement "to be signed by customers as part of all vehicle transactions . . . along with a Buyer's Order and a [RISC]." He attached to his affidavit a form document, which he stated was the "Arbitration Agreement incorporated in Liberty Ford's Buyer's Orders during the relevant time period." Mr. Freeman also stated in his affidavit that the "Liberty Ford records [we]re unavailable," but the attached Arbitration Agreement was a "record kept by the dealership in the course of its regularly conducted business."

Mr. Lyles filed an opposition to Santander's motion to compel arbitration, contending that he and Liberty Ford never entered into an arbitration agreement. He asserted that he did not sign the Separate Arbitration Agreement when he purchased the vehicle, and there was no evidence of a signed agreement in the record.[6] Mr. Lyles also

---

[6] Mr. Lyles also filed a declaration in support of his opposition, stating that he never reviewed, executed, or was presented with a "SEPARATE ARBITRATION AGREEMENT" at any time during the transaction to purchase the vehicle.

7

submitted a sworn declaration by Mr. Freeman ("Freeman Declaration"), prepared after the Freeman Affidavit, that he had "no personal knowledge of what documents were presented to [Mr.] Lyles . . . with respect to the purchase of the vehicle" or "of what documents [Mr.] Lyles did or did not sign." Mr. Freeman also stated that the "standalone Arbitration Agreement required both the purchaser and [Liberty] to sign in order for the standalone Arbitration Agreement to become effective." Mr. Freeman asserted that Liberty "does not have any records or documents related to [Mr. Lyles'] transaction with [Liberty]."

Mr. Lyles argued in his opposition that, even if he had agreed to arbitration with Liberty Ford by signing the Buyer's Order, Santander, as assignee of Liberty Ford's interest in the RISC, could not enforce that arbitration provision because the integration clause in the RISC between him and Santander did not incorporate the Buyer's Order. Rather, the integration clause in the RISC specified that only the RISC and any addenda "comprise the entire agreement between [Lyles] and [Santander]." Finally, Mr. Lyles asserted that the Separate Arbitration Agreement was not properly incorporated into the Buyer's Order, and the arbitration provision in the Buyer's Order was "fatally indefinite," and therefore, unenforceable because it did not set forth the "essential terms" of the arbitration process.

## III.

### Hearing on the Motion to Compel

On August 28, 2023, the circuit court held a hearing on the motion to compel arbitration. Santander stated that the court's analysis of a motion to compel is limited to two questions: (1) "whether the parties entered into a valid and enforceable agreement to arbitrate disputes"; and (2) "whether the scope of the agreement includes resolution of this

8

particular dispute." With respect to the first question, Santander argued that it, as the assignee of the RISC, and Mr. Lyles "entered into a valid and [en]forcible agreement to arbitrate." The Buyer's Order, signed by Mr. Lyles, contained an arbitration provision stating that all disputes pertaining to the purchase and financing of the vehicle would be subject to binding arbitration. Moreover, the Buyer's Order incorporated a separate Arbitration Agreement, which was referenced "in bold and capital letters" and established the specific terms of the arbitration. Santander noted that Mr. Freeman submitted an affidavit stating that the attached arbitration agreement "was the operative agreement at the time Mr. Lyles purchased the vehicle and that the dealership required the buyers to sign it upon purchase." Santander argued that, because Mr. Lyles acknowledged that he "read and understood" the terms and conditions of the Buyer's Order, including the arbitration provision, he was bound by it.

Even if the Separate Arbitration Agreement was not incorporated into the Buyer's Order, Santander argued that the arbitration provision in the Buyer's Order was sufficient by itself to compel arbitration under Maryland law. Santander asserted that, under *Ford v. Antwerpen Motorcars Ltd.*, 443 Md. 470 (2015), an arbitration provision contained in a Buyer's Order, but not in a RISC, is still "valid and enforceable" for claims brought under the RISC because the integration clause makes the two contracts "a single enforceable agreement." [7]

---

[7] With regard to the second question, Santander asserted that it was undisputed that Mr. Lyles' claims concerning unlawful service fees fell within the arbitration provision.

9

Mr. Lyles presented two primary arguments in opposition to the motion to compel: (1) Santander presented no evidence that he agreed to arbitration with it or Liberty Ford; and (2) even if he did agree to arbitration with Liberty Ford, Santander as the assignee of the RISC did not obtain the right to compel arbitration. With respect to the second argument, Mr. Lyles asserted that there were two separate integration clauses in the RISC. The first, which expressly applied only to him and Liberty Ford, provided that "this contract along with all other documents signed by you in connection with the purchase of this vehicle comprise the entire agreement between you and us affecting this purchase." The second, which expressly applied to him and Santander, assignee, provided that, "upon assignment of this contract, only this contract and the addenda to this contract comprise the entire agreement between you and the assignee relating to this contract." Mr. Lyles argued the second integration clause "sets forth a very different set of documents that define the scope of the agreement between [Mr.] Lyles and the assignee," and it "expressly limits the agreement between [Mr.] Lyles and the assignee" of the RISC and any addenda.

Mr. Lyles argued that *Ford* was not relevant because that case did not involve an assignee, and therefore, the court did not address the scope of the second integration clause. Because the RISC did not require arbitration, Mr. Lyles argued that Santander's motion to compel should be denied. Moreover, any agreement to arbitrate incorporated into the RISC was between him and Liberty Ford, not Santander.

Finally, Mr. Lyles asserted that there was no signed copy of the Separate Arbitration Agreement in evidence, and he was never provided a copy of the agreement to review at the time of the transaction. The form agreement produced by Santander, signed by a

10

different customer from a different transaction, did not satisfy the Maryland Uniform Arbitration Act's requirement "that a party seeking to compel arbitration . . . prove the existence of a written arbitration agreement." He argued that the Separate Arbitration Agreement was not properly incorporated by reference in the Buyer's Order, and therefore, it was not part of his purchase agreement with Liberty Ford, "let alone Santander." The one-clause arbitration provision in the Buyer's Order also did not confer a right to arbitration upon Santander because: (1) Santander was not a party to that agreement; and (2) the provision was too indefinite to be enforceable.

## IV.

### Court's Ruling

At the close of the hearing, the circuit court issued a ruling from the bench. It noted that a party who signs a contract "is presumed to have read and understood its terms and as such will be bound by its execution." Citing *Ford*, the court stated that "[b]uyer's orders and retail sale contracts for vehicles are considered by law [as] a single transaction and can be construed and interpreted together as . . . evidencing the entire agreement of the parties to a vehicle sale[s] contract." The court explained that, in *Ford*, the "integration clause did not preclude the dealership from invoking [the] arbitration provision in the buyer's order in buyer's action against the dealership" for alleged consumer protection violations.

In this case, the Buyer's Order clearly stated that the parties "irrevocably agree[d]" to binding arbitration with respect to any dispute arising out of the purchase or financing of the vehicle "pursuant to the separate agreement to arbitrate the disputes . . . attached hereto and incorporated by reference thereto for specific details." Based on this language,

11

and the fact that Mr. Lyles signed this contract, the court found that "there is an arbitration agreement . . . it does exist," and the agreement "encompasses the scope" of Mr. Lyles' claims regarding the financing of the vehicle. Although not all details of arbitration were set out in the Buyer's Order, "it [wa]s enough," and the arbitrator could determine other details. The court stayed the proceedings and ordered arbitration.

This appeal followed.

## DISCUSSION

Mr. Lyles contends that the circuit court "incorrectly determined" that he agreed to arbitrate his claims against Santander, and it erred in granting Santander's Motion to Compel. Initially, he argues that he has no obligation to arbitrate disputes, asserting that "[t]he Separate Arbitration Agreement is not binding" on him because he did not "receive, review, or sign the Separate Arbitration Agreement." He further argues that the clause in the Buyer's Order that says all disputes must be resolved by arbitration is insufficient to compel arbitration because the terms are "too indefinite" to enforce under Maryland law.

Mr. Lyles further argues that, even if the Buyer's Order and Arbitration Agreement were incorporated into the RISC, and signed by him, the agreement to arbitrate was between only Mr. Lyles and Liberty Ford. He argues that the RISC, which was assigned to Santander, "does not create a contractual right for Lyles or Santander to arbitrate disputes against each other" because the express terms of the integration clause provide that, upon assignment, the agreement between him and Santander constituted only the RISC and "the addenda to this contract." Because there was no addenda to the RISC, and neither the

12

Buyer's Order nor the Separate Arbitration Agreement were part of the agreement between Mr. Lyles and Santander, there was no agreement to arbitrate with Santander.

Santander contends that the circuit court correctly held that there was a valid agreement to arbitrate between Mr. Lyles and Santander. It argues that "the irrefutable evidence demonstrates that the parties intended to be bound by the Buyer's Order and its conspicuous Arbitration Provision," and Mr. Lyles signed the document acknowledging that he "read and understood its terms and conditions."

Santander asserts that, as the assignee of the RISC, it "can enforce the terms of the Buyer's Order" because the parties intended the Buyer's Order and the RISC to be read together as one integrated agreement from a single transaction. Santander construes the term "contract" in the RISC's integration clause as referring "to the parties' entire agreement, including the Buyer's Order," not two distinct contracts "each applying to a different party."

## I.

### Standard of Review

An "order to compel arbitration constitutes a final and appealable judgment." *Walther v. Sovereign Bank*, 386 Md. 412, 422 (2005). *Accord Deer Auto. Grp., LLC v. Brown*, 454 Md. 52, 65 (2017) ("[O]rders *granting* requests to compel arbitration are final, appealable orders because they terminate the underlying action and put the parties out of the court issuing the order.").[8] Our "review of a trial court's order compelling arbitration

---

[8] This is true even when the circuit court has stayed proceedings pending the outcome of arbitration. *See Walther v. Sovereign Bank*, 386 Md. 412, 420 n.4 (2005).

13

'extends only to a determination of the existence of an arbitration agreement.'" *Access Funding, LLC v. Linton*, 482 Md. 602, 639 (2022) (quoting *Holloman v. Cir. City Stores, Inc.*, 391 Md. 580, 588 (2006)).  A circuit court's determination that a dispute is subject to arbitration is a question of law, which we review *de novo* for legal correctness.  *Id.* at 639.

## II.

## Arbitration Framework

Arbitration is a process created by contract "whereby parties voluntarily agree to substitute a private tribunal" for the legal process "otherwise available to them."  *Access Funding*, 482 Md. at 640 (quoting *Holloman*, 391 Md. at 590).  Arbitration agreements executed in transactions involving interstate commerce are governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16.  *Id.*  The Maryland Uniform Arbitration Act, ("MUAA"), Md. Code Ann., Cts & Jud. Proc. ("CJ") §§ 3-201 to -234 (2020 Repl. Vol.), "was purposefully meant to mirror the language of the FAA," and it "embodies [the FAA's] legislative policy favoring enforcement of executory agreements to arbitrate."  *Id.* at 641.  Under both the FAA and the MUAA, a written agreement to arbitrate "is valid and enforceable, and is irrevocable, except upon grounds that exist at law or in equity for the revocation of a contract."  CJ § 3-206(a); 9 U.S.C. § 2.

The MUAA establishes the process for a party to petition a court to compel arbitration.  CJ § 3-206(a).  It "gives the court the authority to determine whether a valid arbitration agreement exists."  *Access Funding*, 482 Md. at 641.  The court's function in a suit to compel arbitration is limited "to the resolution of a single issue—is there an agreement to arbitrate the subject matter of a particular dispute."  *Id.* (quoting *Gold Coast*

14

*Mall, Inc. v. Larmar Corp.*, 298 Md. 96, 103 (1983)). Whether a valid arbitration agreement exists is a threshold issue that is always decided by the court, not an arbitrator. *Id.* at 642. "If an arbitration agreement *does* exist, the court must enforce it by ordering the parties to arbitrate." *Park Plus, Inc. v. Palisades of Towson, LLC*, 478 Md. 35, 51 (2022); *see also* CJ § 3-207 ("If the court determines that the [arbitration] agreement exists, it shall order arbitration."). Absent an express agreement to arbitrate, the parties cannot be "compelled to submit to arbitration in contravention of [their] right to legal process." *Ford*, 443 Md. at 477 (quoting *Curtis G. Testerman Co. v. Buck*, 340 Md. 569, 579 (1995)). *Accord Access Funding*, 482 Md. at 640.

## III.

### Analysis

#### A.

#### Agreement to Arbitrate

We begin with the two distinct issues a circuit court must address when considering a motion to compel arbitration: "(1) whether an agreement to arbitrate exists; and (2) whether a particular dispute falls within the scope of the arbitration agreement." *Access Funding*, 482 Md. at 642. Mr. Lyles does not dispute that his claims in the complaint against Santander would fall within the scope of the arbitration provision. Thus, we focus on the first issue.

Whether a valid agreement to arbitrate exists is governed by contract principles. *Ford*, 443 Md. at 477. As the Supreme Court of Maryland explained:

15

"The fundamental rule in the construction and interpretation of contracts is that the intention of the parties as expressed in the language of the contract controls the analysis." *Buck*, 340 Md. at 580. "In construing contracts, Maryland follows the objective interpretation principle. If the language of the contract is unambiguous, we give effect to its plain meaning and do not delve into what the parties may have subjectively intended." *Rourke v. Amchem Prods., Inc.*, 384 Md. 329, 354 (2004). "[A] party who signs a contract is presumed to have read and understood its terms and as such will be bound by its execution . . . [W]e are loath to rescind a conspicuous agreement that was signed by a party whom now, for whatever reason, does not desire to fulfill that agreement." *Koons Ford of Balt., Inc. v. Lobach*, 398 Md. 38, 46 (2007) (citations omitted).

*Id.* at 477 (cleaned up).

Despite the clear arbitration language in the Buyer's Order, Mr. Lyles contends that he did not agree to arbitrate his disputes. He argues that the arbitration provisions in the Buyer's Order, by themselves, are "too indefinite to create any obligation to arbitrate." He further asserts that the Separate Arbitration Agreement was not properly incorporated by reference into the Buyer's Order.

Santander disagrees. It argues that the Buyer's Order included a clear arbitration provision, and it expressly incorporated the Separate Arbitration Agreement, which mandates that disputes be resolved by arbitration. Under these circumstances, Santander argues that Mr. Lyles "cannot seriously dispute that he intended to arbitrate all disputes."

Here, as indicated, the Buyer's Order stated, in bold, as follows:

The parties irrevocably agree that any controversy, claim or dispute arising out of or relating to the purchase or *the financing* of this vehicle including but not limited to this Purchase Agreement or breach thereof shall be settled by binding arbitration, pursuant to the separate Agreement to Arbitrate Disputes.

(Emphasis added). The Buyer's Order clearly contained an agreement to arbitrate disputes.

16

Mr. Lyles contends, however, that the terms of the agreement to arbitrate were too indefinite to enforce. We disagree.

The omission of specific terms and procedures governing the arbitration process does not render an arbitration provision unenforceable. *See Bloch v. Bloch*, 115 Md. App. 368, 379 (1997) ("lack of specificity" in provision stating that disputes regarding the inability to pay alimony "shall be resolved by resorting to final and binding arbitration" was "not fatal to the agreement"). *Accord Schulze & Burch Biscuit Co. v. Tree Top, Inc.*, 831 F.2d 709, 716 (7th Cir. 1987) (provision stating that "ALL DISPUTES UNDER THIS TRANSACTION SHALL BE ARBITRATED IN THE USUAL MANNER" was "not too vague to be enforced"). Rather, the key determination is whether the provision compelling arbitration is unambiguous. *Schulze*, 831 F.2d at 716 ("What the clause requires the parties in the present case to do is clear: arbitrate all disputes."). If the parties clearly agree to arbitration, even a sparse arbitration clause will be enforced. *Bloch*, 115 Md. App. at 379 ("While this clause may be sparse, it is not ambiguous.").

Although it may be the better practice for parties to address details such as the location of the arbitration, identity of the arbitrator, and cost sharing arrangements in a contract's arbitration provision, the "absence of these details" does not defeat an agreement to arbitrate because the MUAA is designed to provide these "gap-fillers." *Bloch*, 115 Md. App. at 375. As we explained in *Bloch*:

> [MUAA S]ection 3-211 provides for the appointment of arbitrators by the court if the agreement is otherwise silent: "A court shall appoint one or more arbitrators if . . . [t]he arbitration agreement does not provide a method of appointment." CJ § 3-211(c)(1). Similarly, "[u]nless the arbitration agreement provides otherwise, the award shall provide for payment of the

17

arbitrators' expenses, fees, and any other expense incurred in the conduct of the arbitration." CJ § 3-221(a). The award may not, however, "include counsel fees," unless the arbitration agreement provides otherwise. CJ § 3-221(b). Furthermore, "[u]nless the agreement provides otherwise, the arbitrators shall designate a time and place for hearing and notify the parties ... not less than five days before the hearing." CJ § 3-213(a). "On petition of a party, the court may direct the arbitrators to proceed promptly with the hearing and determination of the controversy." CJ § 3-213(d). Finally, "[t]he majority of the arbitrators may determine any question and render a final award." CJ § 3-215(a). *Thus, through resort to the Maryland Uniform Arbitration Act, the court's concerns can be answered when, as here, the agreement is otherwise silent*.

*Id*. at 375-76 (emphasis added). *Accord Schulze*, 831 F.2d at 716 (FAA "contemplates" general arbitration clauses and sets forth a process for naming an arbitrator and choosing the location of arbitration); *Syndnor v. Conseco Fin. Servicing Corp.*, 252 F.3d 302, 306 (4th Cir. 2001) (arbitration agreement was not "unconscionable because of unknown cost, fees, and procedures").

Here, the circuit court concluded that, although all the terms of the arbitration were not stated, "it [wa]s enough" under Maryland law to find that the parties mutually agreed to arbitrate disputes. We perceive no error of law in this regard. *See Park Plus, Inc.*, 478 Md. at 41, 58 (undisputed that clause which stated that claims shall be resolved by binding arbitration, but omitted specific terms, was enforceable).

Moreover, as Santander notes, the Buyer's Order referred to a Separate Arbitration Agreement, which *did* specify arbitration terms. Mr. Lyles contends, however, that he did not see or sign the Separate Arbitration Agreement, and therefore, it was not validly incorporated by reference into the Buyer's Order.

18

"[U]nder Maryland law, a party who signs a contract is presumed to have read and understood its terms and as such will be bound by its execution." *Holloman*, 391 Md. at 595.

> One is under a duty to learn the contents of a contract before signing it; if, in the absence of fraud, duress, undue influence, and the like he fails to do so, he is presumed to know the contents, signs at his peril, suffers the consequences of his negligence, and is estopped to deny his obligation under the contract.

*Holzman v. Fiola Blum, Inc.*, 125 Md. App. 602, 629 (1999) (quoting 17 C.J.S. *Contracts* § 137(b) (1963)). This is true even if the party never receives or signs the separate agreement. *See Harby ex rel. Brooks v. Wachovia Bank, N.A.*, 172 Md. App. 415, 423 (2007).

In *Harby*, we held that a bank customer was bound by the arbitration provision contained in a separate deposit agreement because it was expressly incorporated into the signature card that the customer signed when opening an account. *Id.* at 423-24. Because the customer signed the signature card indicating that she "understood its terms and agreed to be bound by them," and the terms included a separate agreement containing an arbitration provision, we held that the arbitration provision was enforceable, even though (1) the signature card itself did not reference arbitration and (2) the customer did not sign the separate agreement. *Id.* at 421, 424.[9]

Applying these principles here, we conclude that Mr. Lyles' failure to sign or receive the Separate Arbitration Agreement does not make the arbitration provision

---

[9] Here, in contrast, the Buyer's Order itself contained a clause notifying Mr. Lyles that disputes regarding the financing agreement were subject to arbitration.

19

unenforceable. Mr. Lyles signed the Buyer's Order acknowledging that he "read and underst[oo]d its terms and conditions, *including the reverse side hereof.*" (Emphasis added). He also acknowledged that he had "been given the opportunity to review all documents prior to signing them and that [he had] not signed any documents in blank." Mr. Lyles' signature is directly below a conspicuous notice in all caps and bold lettering stating: "**NOTICE: SEE REVERSE SIDE AND SEPARATE ARBITRATION AGREEMENT FOR IMPORTANT INFORMATION ON YOUR RIGHTS AS TO RESOLVING DISPUTES, CONTROVERSIES OR CLAIMS ARISING FROM THIS ORDER.**" On the reverse side of the document, there is a statement in bold, capital letters that the parties agree that any dispute will be settled by binding arbitration. It directed Mr. Lyles to: "**SEE SEPARATE ARBITRATION AGREEMENT ATTACHED HERETO AND INCOPORATED BY REFERENCE HEREIN FOR SPECIFIC DETAILS.**"

By signing under a statement that he had read and understood the terms of the Buyer's Order, including the provision incorporating the Separate Arbitration Agreement, Mr. Lyles acknowledged that he was on notice of the separate agreement. Under Maryland law, Mr. Lyles is "presumed to know the contents" of the agreement, and in failing to request a copy of it, he "suffers the consequences of his negligence, and is estopped to deny his obligation under the contract." *Holzman*, 125 Md. App. at 629. *Accord Harby*, 172 Md. App. at 423 ("We have no trouble applying the contract rules [of incorporation by reference] to enforce the arbitration terms and conditions in the [separate] Deposit

Agreement."). Accordingly, Mr. Lyles did agree with Liberty Ford to submit disputes, including those relating to financing, to arbitration.

## B.

### Right of Santander to Compel Arbitration

The question then is whether Santander can compel arbitration based on that agreement. The RISC provides, immediately under the signatures of Liberty Ford and Mr. Lyles, that Liberty Ford assigned "its interest in this contract" to Santander. "[A]n assignee generally has the same rights and responsibilities as its assignor." *Nationstar Mortg. LLC v. Kemp*, 476 Md. 149, 156 (2021). The "assignee stands in the shoes of the assignor." *Id.* at 157 (quoting *Kemp's Ex'x v. M'Pherson*, 7 H. & J. 320, 336 (Md. 1826)). *Accord Roberts v. Total Health Care, Inc.*, 349 Md. 499, 511 (1998) (assignment of an interest in a contract to a third party generally "transfer[s] all interests in the property from the assignor to the assignee"); *Thompkins v. Mountaineer Invs., LLC*, 439 Md. 118, 139-40 (2014) (in contract for sale of goods, there is a presumption that an assignee assumes rights, benefits, and privileges under a contract, as well as assignor's obligations). Accordingly, Santander, the assignee of the RISC, generally would stand in the shoes of its assignor, Liberty Ford, and could raise the same claims or defenses that Liberty could under the RISC.

Mr. Lyles contends, however, that because Santander is an assignee only of the RISC, it cannot enforce the arbitration provisions in the Buyer's Order or the Separate Arbitration Agreement. We disagree.

As the Supreme Court of Maryland has noted, "[w]here several instruments are made a part of a single transaction they will all be read and construed together as evidencing the intention of the parties in regard to the single transaction." *Ford*, 443 Md. at 479 (quoting *Rocks v. Brosius*, 241 Md. 612, 637 (1966)). *Accord Rourke*, 384 Md. at 354 ("Where the contract comprises two or more documents, the documents are to be construed together, harmoniously, so that, to the extent possible, all of the provisions can be given effect."). Thus, a Buyer's Order and an RISC may be "read together as constituting one transaction." *Ford*, 443 Md. at 483.

In *Ford*, the Court addressed whether the arbitration provision in a Buyer's Order compelled the purchasers to arbitrate their claims against the dealership when the separate RISC, signed on the same day, did not provide for arbitration. *Id.* at 474. The purchasers argued that "the Buyer's Order was superseded by the RISC, which contained no arbitration agreement." *Id.* at 475. The Court disagreed, noting the well-established law that documents may be construed together as part of a single transaction. *Id.* at 478-79. In looking at the documents involved in that case, the Court noted that the Buyer's Order and the RISC, which were signed on the same day, indicated an intention that they "be construed together as part of the same transaction." *Id.* at 482. The RISC contained an integration clause incorporating by reference the arbitration provision in the Buyer's Order, providing that "[t]his contract along with all other documents signed by you in connection with the purchase of this vehicle, comprise the entire agreement." *Id.* at 478-79 (emphasis omitted). The Buyer's Order also stated that it, along with other documents signed in connection with the Order, comprised the entire agreement between the parties. *Id.*

22

Finally, the arbitration agreement in the Buyer's Order defined "dispute" as any monetary claim arising from, among other things, any retail installment sales contract. *Id.* at 482-83.

Under these circumstances, the Court held that the Buyer's Order and the RISC were to be construed together as showing the entire agreement of the parties. *Id.* at 483. The Court, therefore, affirmed the circuit court's ruling granting the dealership's motion to compel arbitration. *Id.*

To be sure, as Mr. Lyles notes, *Ford* involved a dispute between the purchaser and the dealership, and this case involves the purchaser and the assignee of the RISC, Santander. That factual difference, however, does not help Mr. Lyles.

In *Rota-McLarty v. Santander Consumer USA, Inc.*, 700 F.3d 690 (4th Cir. 2012), the Court addressed a case where Santander sought, as it does here, to compel arbitration as an assignee. Similar to this case, the Buyer's Order contained an agreement to arbitrate, and the RISC did not contain an arbitration provision. *Id.* at 695. The RISC contained an integration clause stating: "This contract contains the entire agreement between you and us relating to this contract." *Id.* The car dealer assigned the RISC to Santander after the sale. *Id.* The Court addressed "whether Santander, as an assignee only to the RISC, which contains an integration clause providing that it is the complete agreement between the parties, and not the Buyer's Order, which includes the arbitration language, could invoke arbitration." *Id.* at 699. Noting that Maryland law provides that documents made as part of a single transaction should be interpreted together if that is the intent of the parties, the Court looked to the language of the documents. *Id.* at 700. In that case, the Buyer's Order

23

referenced the assignee of the RISC,[10] and it defined "the 'Agreement' collectively with other documents made in connection with the Buyer's Order." *Id.* Accordingly, the Court concluded that both contracts should be read together as a single agreement, and Santander, as an assignee, could enforce the arbitration agreement. *Id.*

These cases make clear that a Buyer's Order and a RISC can be construed together to constitute the entire agreement if the language of the documents indicate that intention. Accordingly, we assess the specific language of the documents here to determine the intent of the parties.

As indicated, the RISC stated:

> This contract, along with all other documents signed by you in connection with the purchase of this vehicle, comprise the entire agreement between you and us affecting this purchase. No oral agreements or understandings are binding. Upon assignment of this contract: (i) only this contract and the addenda to this contract comprise the entire agreement between you and the assignee relating to this contract.

This language is the same as the language used in the RISC in *Ford*, 443 Md. at 491. As indicated, the Supreme Court held in *Ford* that this integration clause[11] indicated

---

[10] The court noted as an example that the arbitration provision in the Buyer's Order stated that: "The parties understand that they have a right or opportunity to litigate disputes through a Court, but that they prefer to resolve their disputes through arbitration, except that the Dealer (or the Assignee of any Retail Installment Sales Contract) may proceed with Court action in the event the Purchaser fails to pay any sums due under the Agreement." *Rota-McLarty*, 700 F.3d at 700 n.9.

[11] An integration or merger clause in a contract provides that the agreement is the final agreement of the parties, "such that it 'supersedes all informal understandings and oral agreements relating to the subject matter of the contract.'" *Adventist Healthcare, Inc. v. Behram*, 488 Md. 410, 441 (2024) (quoting *Integration Clause, Black's Law Dictionary* 963 (11th ed. 2019)).

24

that the RISC and the Buyer's Order be construed together as part of the same transaction and allowed the dealer to enforce the arbitration agreement in the Buyer's Order for disputes arising under the RISC. *Id.* at 482.

Mr. Lyles contends, however, that the third sentence, which addresses assignment of the contract, requires a different result when the dispute is with the assignee. He argues that the plain terms of the integration clause provide that his agreement with Liberty Ford consisted of the RISC and "all other documents signed by" him, but the agreement with Santander, as assignee, consisted of "this contract," which he construes as the RISC, and "the addenda" to the RISC. He asserts that neither the Buyer's Order nor the Separate Arbitration Agreement constituted "this contract" or "the addenda," and therefore, they were not part of the agreement between him and Santander.

We are not persuaded. We read the two sentences quoted above in context. The first sentence, as in *Ford*, makes clear that the RISC and the Buyer's Order, including the arbitration agreement, are to be read together as the agreement between the parties. The third sentence provides that, upon assignment, "this contract," which refers to the agreement discussed in the first sentence (including all documents signed), as well as any addenda, constitutes the entire agreement between the assignee and Mr. Lyles.[12] The integration clause does not prevent reading both documents together as part of a single transaction.

---

[12] The third sentence including "the addenda" allows the purchaser and the assignee to make further agreements as desired.

25

We hold that the Buyer's Order and RISC should be interpreted together as part of a single transaction, and the assignee obtained all the rights of the assignor, including the right to compel arbitration. The circuit court properly granted Santander's motion to compel arbitration.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**